No. 93,465

STATE OF KANSAS, *Appellee*, v. JOHN P. KIRKPATRICK, *Appellant*.

(184 P.3d 247)

Opinion filed May 30, 2008.

*Randall L. Hodgkinson,* of Kansas Appellate Defender Office, argued the cause, and *Matthew J. Edge,* of the same office, was with him on the brief for appellant.

*Matt J. Maloney,* assistant district attorney, argued the cause, and *Nola Tedesco Foulston,* district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MCFARLAND, C.J.: John P. Kirkpatrick appeals his jury trial conviction of the first-degree felony murder of Jacob Williams. He received a life sentence with eligibility for parole after 20 years.

Kirkpatrick contends: (1) the trial court erred in denying his request for instructions on lesser included offenses of voluntary and involuntary manslaughter; (2) it was error for the district court to deny his motion to suppress his statements to the police; (3) the trial court abused its discretion in permitting the lead police investigator to sit at the prosecution table; (4) the trial court denied him a fair trial by quoting the Bible at the beginning of the trial; (5) the trial court erred in denying his motion for a continuance in order to hire private counsel; (6) the trial court erred in denying his motion to recall the jury; and (7) he is entitled to a new trial based upon cumulative error.

We affirm.

## FACTS

On the evening of January 22, 2004, the defendant, John Kirkpatrick, and his friend, Garrod Farha, went to Mulligan's Pub in Wichita. Also at the bar were their friends, Rob Powers and Thomas Wright. Two friends of Powers, Jasen Tedlock and Jake Williams, were at the bar. The group stayed at the bar until approximately 1:45 a.m., when the bar was closing. Powers invited about a dozen people to come to his apartment, including all of the above-named individuals.

Powers and several of the guests were interested in car racing, and a loud discussion at the apartment occurred concerning who had the fastest car. Several times Powers advised his guests to quiet down as he was concerned about the noise bothering his neighbors in surrounding apartments. This admonition did not lower the noise level. Finally, Powers stated he would ask the next person who raised his voice to leave. Wright raised his voice, and Powers asked him to leave. Wright was unhappy with the request but walked outside with Powers, followed by Tedlock, Farha, and Kirkpatrick. Powers explained the request to leave was nothing personal. An argument erupted between Tedlock and Farha. Tedlock may have attempted to strike Farha. In any event, a scuffle broke out. Tedlock may have pulled a knife. The argument ended when Williams came out and took Tedlock back inside the apartment.

Kirkpatrick, Farha, and Wright then left. They drove to Farha's house, where Farha took possession of his roommate's handgun. The three men put Farha and Kirkpatrick's dog, a 75- to 80-pound pit bull, into the car and then drove back to Powers' apartment. During the drive, Kirkpatrick said that no one "disses my set."

When they arrived at Powers' apartment, Farha handed the gun to Kirkpatrick, who placed it in his waistband. Powers came out of the apartment with Tedlock and Williams remaining inside. Powers saw Farha holding the pit bull by the collar and asked why they had brought the dog. Powers continued to ask them what was going on but received no response. Kirkpatrick then pulled the gun out of his waistband. Powers moved in front of him and asked why he had a gun. According to Powers, Kirkpatrick responded that he was representing his "set," and he would continue to do so until he died. At the same time, Powers saw Farha kicking the door to Powers' apartment. Powers attempted to calm Kirkpatrick and asked him to hand over the gun. Kirkpatrick refused and instead fired a single shot into the door of Powers' apartment. After the shot, Powers grabbed Kirkpatrick and asked him what he was doing. After 3 or 4 seconds passed, Kirkpatrick shoved Powers away and fired two more shots into the door. Kirkpatrick, Farha, and Wright then ran to the parking lot.

Tedlock testified that, while inside the apartment, he and Williams heard the argument. Tedlock looked out the apartment window and saw a man holding a dog. As he closed the window, someone attempted to kick in the apartment door; however, the chain lock prevented its complete opening. When the door came partially open, Williams ran up to the door, pushed his body up against it, and locked the deadbolt. At that point, shots came through the door. Williams fell back onto Tedlock and said that he had been shot. Williams and Powers called 911. Paramedics transported Williams to the hospital where he died later that day.

Kirkpatrick was charged with one count of first-degree felony murder with the underlying felony being criminal discharge of a firearm at an occupied dwelling pursuant to K.S.A. 21-4219(b) (Furse). At trial numerous witnesses, including Tedlock and Powers, testified on behalf of the State. Kirkpatrick and Wright both

testified on Kirkpatrick's behalf, but Farha invoked his right against self-incrimination. The jury returned a guilty verdict on the single count before us, and the trial court sentenced Kirkpatrick to life in prison with the possibility of parole after 20 years.

Additional facts will be provided as necessary for the resolution of particular issues.

## DID THE TRIAL COURT ERR IN DENYING THE DEFENDANT'S REQUEST FOR INSTRUCTIONS ON VOLUNTARY AND INVOLUNTARY MANSLAUGHTER AS LESSER INCLUDED OFFENSES?

The defendant contends he was entitled to these instructions on various grounds. The defendant testified at trial that he saw, through the sliding glass door, Tedlock armed with a gun and heard Tedlock threaten to kill him. Tedlock then made a move toward the front door. At that point, Kirkpatrick said, he fired three shots at the door because he feared for his life and the lives of his two friends. Kirkpatrick claimed he believed that by firing the gun he would prevent Tedlock from stepping outside of the apartment.

The only gun found inside the apartment was a .45 caliber semi-automatic handgun. The gun was in a case that was on the upper shelf of a bedroom closet. A towel and some neatly folded clothing were stacked on top of the case. The magazine was out of the gun and was stored in its separate compartment in the case.

Wright's testimony controverted Kirkpatrick's recitation of events. Wright testified that once the group returned to Powers' apartment, Tedlock was not doing anything behind the sliding glass door. Further, Wright stated that he did not see anyone (other than Kirkpatrick) with a gun. Wright testified that Kirkpatrick did not have a reason to shoot the door. Tedlock's testimony supported Wright's position. Tedlock stated that he had not waved a pistol in the window. Tedlock also testified that he had not threatened to shoot anyone.

Kirkpatrick requested a jury instruction on self-defense based upon K.S.A. 21-3211 (Furse), which provides: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is

necessary to defend himself or another against such aggressor's imminent use of unlawful force." The State did not oppose the giving of that instruction, but requested an instruction concerning self-defense by an aggressor pursuant to PIK Crim. 3d 54.22 (initial aggressor's use of force). The court gave both instructions. Kirkpatrick also requested instructions on several lesser included offenses of first-degree felony murder: voluntary manslaughter based upon all three theories contained in K.S.A. 21-3403 and (b) and reckless involuntary manslaughter under K.S.A. 2004 Supp. 21-3404(a). He argued, among other things, that his defense of self-defense put "imperfect self-defense," which he asserted was a type of voluntary manslaughter, into play.

The district court denied Kirkpatrick's request for lesser included offense instructions, holding that an instruction for voluntary manslaughter was not warranted because there was no evidence of an intentional killing and an instruction for involuntary manslaughter was not warranted because there was no evidence of recklessness.

On appeal, Kirkpatrick argues the trial court erred in refusing his request to instruct the jury on imperfect self-defense voluntary manslaughter and involuntary manslaughter as lesser included offenses to first-degree felony murder.

As a general rule,

"[t]he duty to instruct on a lesser included offense arises only where there is evidence supporting the lesser crime. The evidence of a lesser included offense need not be strong or extensive as long as it presents circumstances from which the lesser offense might reasonably be inferred. Such an instruction must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant." *State v. Horn*, 278 Kan. 24, Syl. ¶ 6, 91 P.3d 517 (2004).

This general rule, however, does not apply in a felony-murder case:

" 'When murder is committed during the commission of a felony, the rule requiring instructions on lesser included offenses does not apply. The felonious conduct is held tantamount to the elements of deliberation and premeditation which are otherwise required for first-degree murder. It is only when the evidence of the underlying felony is weak, inconclusive, or conflicting that instructions on

lesser included offenses may be required.' [Citation omitted.]" *State v. Calvin,* 279 Kan. 193, 201-02, 105 P.3d 710 (2005).

Kirkpatrick argues that to the extent his claim of self-defense would negate the criminal intent required for the underlying felony of criminal discharge of a firearm at an occupied dwelling, the evidence that the trial court found strong enough to warrant the self-defense instruction necessarily rendered the evidence of the underlying felony inconclusive. Accordingly, the rule prohibiting lesser included offenses to felony murder does not apply, and he was therefore entitled to instructions for "imperfect self-defense" voluntary and involuntary manslaughter.

The State argues that the evidence of the underlying felony is not weak or inconclusive and, therefore, an instruction on lesser included offenses is not warranted because of the felony-murder rule. In the alternative, the State argues that the district court correctly found that an instruction for voluntary manslaughter was not warranted because there was no evidence of an intentional killing and that an instruction for reckless involuntary manslaughter was not warranted because there was no evidence of recklessness. Finally, the State correctly observes that Kirkpatrick did not request an instruction on involuntary manslaughter under the imperfect self-defense version, K.S.A. 2004 Supp. 21-3404(c) (a killing during the commission of a lawful act in an unlawful manner), which is a cornerstone of his argument on appeal concerning instructing on this offense. Instead, Kirkpatrick's request at trial was for reckless involuntary manslaughter under K.S.A. 2004 Supp. 21-3404(b).

Kirkpatrick's argument that he was entitled to instructions on imperfect self-defense voluntary manslaughter and involuntary manslaughter rests on the fact that the trial court gave a self-defense instruction. The problem, however, is that Kirkpatrick was not entitled to a self-defense instruction.

K.S.A. 21-3214(1) provides that self-defense is not available to a person who "[i]s attempting to commit, committing, or escaping from the commission of a forcible felony." A "forcible felony" includes "any . . . felony which involves the use or threat of physical force or violence against any person." K.S.A. 21-3110(8)

(Furse) (defining forcible felony to include, *inter alia*, murder, voluntary manslaughter, aggravated battery, and "any other felony which involves the use or threat of physical force or violence against any person").

In *State v. Bell*, 276 Kan. 785, 80 P.3d 367 (2003), we held that criminal discharge of a firearm at an occupied vehicle is a forcible felony and, therefore, where the offense of criminal discharge of a firearm at an occupied vehicle serves as the underlying felony in a felony-murder prosecution, K.S.A. 21-3214(1) precludes the giving of a self-defense instruction. 276 Kan. at 792-93.

The facts in *Bell* are remarkably similar to the facts in this case. Jonathan Baptista and his friends got into an argument with Ernie Bishop and Shawn Cox. Bishop said he was going to get some friends together and come back in 10 minutes and kill all of them. Baptista and his group said they too would come back with more friends. Subsequently, Baptista recruited the defendant, Bell, and others to join them in confronting Bishop and Cox. Because their plan included bringing guns and shooting at the others, Bell retrieved his gun. However, when they arrived at the place where the fight was to occur, Bishop and Cox were not there. They then drove around looking for them.

Meanwhile, Bishop and Cox walked to a car wash where they saw Anthony McCain. Bishop and Cox told McCain about the fight and McCain offered to drive them home. Bell and his group saw Bishop and Cox at the car wash. They followed McCain's Saturn until he eventually pulled over. Bell and his group pulled over, and then Bell and Baptista opened fire on the Saturn, killing McCain.

The evidence about what occurred just before the shooting began was somewhat conflicting. Bell initially told police that they started shooting at the Saturn after Baptista told him it was "now or never." 276 Kan. at 788, 793-94. He later claimed he was acting in self-defense. He said that they started shooting after Baptista yelled, "They've got a gun." 276 Kan. at 788, 793. Baptista testified that he saw the Saturn's driver drop his head as if he were reaching down for a gun. At trial, Bell requested a self-defense instruction, which was denied. Bell was convicted of felony murder, criminal

discharge of a firearm at an occupied vehicle, and criminal damage to property.

On appeal, we affirmed the trial court's denial of his request for a self-defense instruction:

"The defendant requested a self-defense instruction based on K.S.A. 21-3211: 'A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force.' However, K.S.A. 21-3214(1) provides in part that the justification described in 21-3211 is not available to a person who '[i]s attempting to commit, committing, or escaping from the commission of a forcible felony.' See *State v. Jacques*, 270 Kan. 173, Syl. ¶ 1, 14 P.3d 409 (2000).

"K.S.A. 21-3110(8) defines a forcible felony as 'any treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, aggravated battery, aggravated sodomy *and any other felony which involves the use or threat of physical force or violence against any person.*'

"Criminal discharge of a weapon at an occupied vehicle, the underlying felony in this case, is considered a forcible felony. See *State v. Mitchell*, 262 Kan. 687, 694, 942 P.2d 1 (1997). As the defendant was charged with the forcible felonies of first-degree murder and criminal discharge of a firearm at an occupied vehicle, he was excluded from a self-defense instruction by K.S.A. 21-3214(1)." 276 Kan. at 792-93.

*Bell* applies in this case. Criminal discharge of a firearm at an occupied vehicle and at an occupied dwelling are the same crime and, thus, are both forcible felonies. K.S.A. 21-4219(b) (Furse) (criminal discharge of a firearm at an *occupied building or occupied vehicle* is the malicious, intentional, and unauthorized discharge of a firearm at a *dwelling*, building, structure, *motor vehicle . . .* in which there is a human being). Accordingly, K.S.A. 21-3214(1) precluded the giving of a self-defense instruction in this case. Because self-defense is not available in a felony-murder case where the underlying felony is criminal discharge of a weapon at an occupied dwelling, it follows that self-defense cannot serve to render the evidence of the underlying felony weak, inconclusive, or conflicting, so as to overcome the prohibition of lesser included offense instructions to a charge of felony murder.

The dissent criticizes us for "reaching out" to address the issue of the availability of self-defense under K.S.A. 21-3214. It is true that this issue was not raised on appeal. At trial, the State did not

oppose the giving of a self-defense instruction. Interestingly, during the instructions conference, the trial court noted the *Bell* case and its holding that the defendant was not entitled to a self-defense instruction. Nevertheless, the trial court gave the instruction and on appeal no one argues that the instruction should not have been given. Error in giving that instruction is beyond our reach as far as our power to affect the result because of it. However, the fact that a self-defense instruction was given then serves as the foundation upon which Kirkpatrick bases his argument that he was entitled to imperfect self-defense lesser included offense instructions. The fact that the defendant received the benefit of an instruction to which he was not entitled and to which no one objected at trial or on appeal does not require that we ratify the error. To accept Kirkpatrick's argument would be to compound that error by extending it to further entitle the defendant to additional instructions to which he would not otherwise have been entitled. The court will not build its analysis on a legally defective foundation.

In response to the dissent, we point out that our holding is limited to the facts of this case. The dissent's hypothetical, in which an individual walking down the street is shot at by a sniper firing from inside an apartment building and who defends himself by returning fire, killing the sniper, is so far removed from the facts herein as to not be even remotely analogous. The policy behind the statute precluding self-defense to a person who was committing a forcible felony is well served under the facts of this case. At all times during the events in this case, Kirkpatrick and his friends were the aggressors. Not content to let the earlier scuffle go, they returned to the scene seeking to exact revenge and prove who was tougher. They brought a large pit bull dog and a gun with them. Once there, they were clearly the aggressors, using the dog and the gun to threaten violence while they tried to kick in the apartment door. Powers tried to calm things down and asked Kirkpatrick to hand over his gun. Kirkpatrick refused and fired a shot into the door. Powers grabbed Kirkpatrick and asked him what he was doing. Kirkpatrick, unfazed by his friend's appeal, shoved Powers out of the way and after several seconds had passed, he fired two more shots into the door.

Moreover, even if it had been appropriate to instruct on self-defense in this case, it does not follow that imperfect self-defense applied to require instructions on voluntary manslaughter or involuntary manslaughter.

Perfect self-defense is a concept based on justification or excuse and operates as a complete defense. It applies broadly to all crimes involving the use of force against another. See K.S.A. 21-3211 (Furse) *et seq.* Imperfect self-defense, in contrast, is based not on justification, but on mitigation and, thus, operates only to reduce criminal culpability to a lesser crime. 40 Am. Jur. 2d, Homicide § 139. Imperfect self-defense is "not a true defense; it does not absolve a defendant of criminal liability. It is, rather, a lesser degree of the crime of homicide." *State v. Carter*, 284 Kan. 312, 326, 160 P.3d 457 (2007). Imperfect self-defense exists only as a lesser degree of homicide in voluntary manslaughter under K.S.A. 21-3403(b) (intentional killing of a human being committed upon an unreasonable but honest belief that circumstances existed that justified deadly force) and in involuntary manslaughter under K.S.A. 2006 Supp. 21-3404(c) (unintentional killing during the commission of a lawful act in an unlawful manner). *State v. Ordway*, 261 Kan. 776, 787, 934 P.2d 94 (1997) (noting that Kansas recognizes imperfect self-defense for unintentional killings under lawful act/unlawful manner involuntary manslaughter).

It is important to note that the claim of self-defense in this case was directed to the underlying felony of criminal discharge of a firearm at an occupied dwelling. But imperfect self-defense exists only as a lesser degree of the crime of homicide. " 'Outside of homicide law, the concept [of imperfect self-defense] doesn't exist. . . . With respect to all other crimes, the defendant is either guilty or not guilty. . . . There is no "in between." ' " 2 LaFave, Substantive Criminal Law § 10.4(i) (2d ed. 2003) (quoting, *Bryant v. State*, 83 Md. App. 237, 244-45, 574 A.2d 29 [1990]) (imperfect self-defense only applies to homicide crimes and their "shadow forms" such as attempted murder; it does not apply to assault, battery, assault with intent to disable, or maiming); see also *Jones v. State*, 357 Md. 408, 422-23, 745 A.2d 396 (2000) (doctrine of

imperfect self-defense applies only to criminal homicide and its shadow forms; it has no applicability to other assaultive crimes).

If imperfect self-defense is asserted to the crime of criminal discharge of a firearm at an occupied dwelling, as argued in this case, voluntary and involuntary manslaughter are *not* mitigated versions of that offense. There is no imperfect self-defense version of criminal discharge of a firearm at an occupied dwelling. Thus, imperfect self-defense is not a defense to criminal discharge of a firearm. Accordingly, a claim of imperfect self-defense cannot serve to render the evidence of the underlying felony of criminal discharge of a firearm weak, inconclusive, or conflicting, so as to require instructions on imperfect self-defense voluntary manslaughter and imperfect self-defense involuntary manslaughter.

The trial court did not err in refusing to instruct the jury on imperfect self-defense voluntary manslaughter and imperfect self-defense involuntary manslaughter.

## WHETHER THE DISTRICT COURT ERRED IN DENYING KIRKPATRICK'S MOTION TO SUPPRESS HIS STATEMENTS TO THE POLICE

Kirkpatrick argues that the district court erred in denying his motion to suppress recorded statements made to Detective Hosty the morning of the shooting. He specifically argues that his statement was not voluntarily given because he was "still intoxicated from a night of drinking."

The State responds that although the district court denied Kirkpatrick's motion at a pretrial hearing, Kirkpatrick failed to object at trial when his statement was entered as evidence and published to the jury. We agree with the State that he has failed to preserve his issue on appeal. See *State v. Holmes*, 278 Kan. 603, 610, 102 P.3d 406 (2004) (when motion to suppress is denied, the moving party must object to the evidence at trial to preserve the issue on appeal).

Even had Kirkpatrick objected at trial, his claim would still fail. Our standard of review is well known: "In reviewing a trial court's decision regarding the suppression of a confession, an appellate court reviews the factual underpinnings of the decision by a sub-

stantial competent evidence standard and the ultimate legal conclusion by a de novo standard." *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 1, 106 P.3d 39 (2005).

This court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *Swanigan*, 279 Kan. at 23.

To determine whether a defendant's confession is voluntary, a court looks at the totality of the circumstances. The prosecution bears the burden of proving by a preponderance of the evidence that a confession is admissible. In determining whether a confession is voluntary, "the essential inquiry is whether the statement was the product of the free and independent will of the accused." *State v. Walker*, 283 Kan. 587, 596, 153 P.3d 1257 (2007). In making this determination, the court considers the following specific factors:

"(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *State v. Walker*, 283 Kan. at 596-97.

The district court's decision to deny the motion to suppress was based upon findings made as a result of the testimony of Detective Hosty. Hosty testified that at approximately 5:50 a.m., he began interviewing Kirkpatrick regarding the incident. He asked for preliminary information such as Kirkpatrick's name, date of birth, and social security number before asking about the facts of the case. According to Hosty, Kirkpatrick answered his questions normally and appeared to be tracking. He did not detect an odor of alcohol or marijuana on Kirkpatrick and did not suspect that Kirkpatrick was under the influence of alcohol or drugs.

After Hosty gathered the preliminary information, he presented Kirkpatrick with a form entitled "Your Rights." First, Hosty asked if Kirkpatrick could read, write, and speak English; Kirkpatrick answered in the affirmative. Next, Hosty asked Kirkpatrick if he had consumed any alcohol or drugs within the previous 24 hours. Kirkpatrick replied that he had consumed three Corona beers, the last at 1:40 a.m., approximately 4 hours earlier. Hosty asked Kirk-

patrick if he felt intoxicated; he replied that he was not. Kirkpatrick also told Hosty that he did not feel intoxicated at any point in the evening. Thereafter, Hosty turned on the recorder, read the *Miranda* warnings to Kirkpatrick, and asked him to read along on the form. After explaining his rights, Kirkpatrick signed the form and elected to speak with Hosty. Hosty testified that Kirkpatrick did not have difficulty communicating. Defense counsel called no witnesses at the suppression hearing. Hosty's testimony is competent and substantial enough to support the trial court's finding that there was no evidence that Kirkpatrick's will was overborne.

## WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN ALLOWING THE LEAD INVESTIGATOR TO SIT AT THE PROSECUTION TABLE

Kirkpatrick next argues that by allowing the lead investigator, Detective Hosty, to sit at the prosecution table, the court denied his right to a fair trial under the Sixth and Fourteenth Amendments. Citing *State v. Randall*, 257 Kan. 482, 894 P.2d 196 (1995), Kirkpatrick asserts that this court's review is unlimited. The State responds that the standard of review applicable to the exclusion or sequestration of witnesses—abuse of discretion—applies.

Following voir dire, defense counsel objected to Hosty's presence at the prosecution table on the ground that it would lend credibility to his testimony. Counsel, however, did not seek to invoke the witness sequestration rule concerning Hosty. In response, the State asserted that it wanted to keep Hosty at the table for convenience, in order to ask him questions and to have him assist by retrieving files. The court overruled the objection, stating that it did not believe Hosty's credibility would be enhanced by his presence at the table. It also noted that the arrangement would lessen any disruption to the proceedings. Finally, the court opined that having Hosty sit in the back row, as opposed to the table, was a "distinction without a difference," as he would be assisting counsel regardless of his position in the courtroom.

Under Kansas law, the standard of review is unclear. A review of law in other jurisdictions, however, points to an abuse of discretion standard: "Allowing a key witness, an expert witness, or some

other person with whom counsel might need to confer during the conduct of the trial, to sit at the counsel's table, is generally held permissible in the discretion of the trial judge." 75 Am. Jur. 2d, Trials § 124 (citing *State v. Fields*, 342 So. 2d 624, 628 [La. 1977]; 87 A.L.R.3d 229; and *Patton v. Avis Rent-A-Car Systems, Inc.*, 44 Mich. App. 556, 561-65, 205 N.W.2d 615 [1973]); see also *Wilmer v. Bd. of County Com'rs of Leavenworth County*, 153 F.R.D. 165, 169 (D. Kan. 1993) ("The decision to allow plaintiff's mother to sit at counsel table is clearly within the court's discretion.").

The district court reviewed *State v. Smith*, No. 77,261, unpublished opinion filed December 31, 1998. There, the district court allowed a KBI agent, who was also a witness, to sit at counsel table during the trial. A panel of the Court of Appeals stated that while it had not been specifically addressed in Kansas, the practice was allowed in other jurisdictions. Ultimately, the panel stated that while the practice was not reversible error, it should be "discouraged." Slip op. at 7-8.

Unpublished Court of Appeals' opinions decided both before and after *Smith* have allowed the practice. See *State v. Mears*, No. 65,971, unpublished opinion filed February 14, 1992 (stating that the prosecutor had a valid reason for requesting the detective's presence at counsel's table and that the record did not indicate his presence prejudiced defendant); *State v. Vontress*, No. 89,820, unpublished opinion filed February 27, 2004 (stating that it was not error for the investigating party to sit at counsel's table during the trial despite a sequestration order); *State v. Pope*, No. 94,673, unpublished opinion filed February 16, 2007 (finding no abuse of discretion in allowing detective to sit at prosecution's table).

We acknowledge that abuse is still a possibility. See *Lollis v. Superior Sales Co.*, 224 Kan. 251, 264, 580 P.2d 423 (1978) ("[t]here is always the danger that a jury will be overly impressed by the testimony of a police officer who gives the impression of being clothed with public authority"). Accordingly, the better practice, as stated in *Smith*, is to discourage law enforcement witnesses from sitting at the prosecutor's table during a jury trial. However, there were practical reasons for allowing Hosty to sit at the table. See *State v. Beauclair*, 281 Kan. 230, 236, 130 P.3d 40 (2006)

(Discretion is abused only when no reasonable person would take the view adopted by the district court, and the objecting party bears the burden of establishing such abuse.). We find no merit in this issue.

## WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING KIRKPATRICK'S REQUEST FOR A CONTINUANCE TO HIRE PRIVATE COUNSEL

Kirkpatrick argues that the district court erred in denying his oral request for a continuance to hire private counsel. Specifically, Kirkpatrick asserts that the district court denied his right to the effective assistance of counsel by summarily denying his motion. Kirkpatrick argues that the court failed to fully inquire as to the nature of his dissatisfaction with appointed counsel.

The district court appointed Christine Gase in January 2004. On July 9, 2004, 3 days prior to trial, Kirkpatrick's appointed counsel informed the court at the suppression hearing that Kirkpatrick wished to obtain a continuance in order to try to hire private counsel:

"MS. GASE [Defense Counsel]: I think this is probably the appropriate time to do it, real briefly. I was talking to Mr. Kirkpatrick this morning. He has indicated that with the appearance, from my conversations with the District Attorney's Office, that there is no possibility of any lesser pleas, he wishes to request a continuance so that he and his family can *try* to obtain private counsel.

"THE COURT: Mr. Disney, does the State wish to be heard on that?

"[PROSECUTOR]: We would object to any continuance, Your Honor. The defendant has competent counsel, does not have a right to counsel of his choosing when he asks for a court-appointed attorney. He's had a continuance. We've set this date a long time ago, and we're ready.

"THE COURT: Well—

"MS. GASE: Your Honor—And the only thing that I would add on that is certainly I understand the District Attorney's position and the Court's position in general that you don't get to choose your appointed counsel, and I would just want to make clear for the record that that is not what he is asking. He is asking for the opportunity to hire counsel.

"THE COURT: Well, to the extent, that it's based on an oral motion to the Court on the eve of trial, I'm going to dismiss—or I'm going to deny that oral request. Those types of matters need to be placed before the presiding judge in a timely fashion, in writing, outlining the reasons why. We're not going to delay the trial at this late state of the game for those reasons. There's been no charge

of incompetence of counsel or—or a desire or inability to work with counsel, so that's a matter totally within the discretion of the presiding judge of the . . . Criminal Department. So that motion is to be made there, and based upon that I'll deny the oral motion. If you want to make it in writing to Judge Waller then that's something else you can do." (Emphasis added.)

Although Kirkpatrick did not address the court regarding his desire to seek to hire private counsel, he was present at the hearing.

The right to the assistance of counsel for one's defense is a fundamental right. *Kimmelman v. Morrison*, 477 U.S. 365, 374, 91 L. Ed. 2d 305, 106 S. Ct. 2574 (1986). "It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 77 L. Ed. 158, 53 S. Ct. 55 (1932). In Kansas, pursuant to K.S.A. 22-4503(b) (Furse), "[i]f the defendant asks to consult with counsel of the defendant's own choosing, the defendant shall be given a reasonable opportunity to do so."

In the present case, Kirkpatrick was represented by appointed counsel at the time he requested other counsel. In the recent case of *State v. McGee*, 280 Kan. 890, 894, 126 P.3d 1110 (2006), this court discussed the standard of review applicable when an indigent defendant requests the appointment of different trial counsel:

"A trial court's refusal to appoint new trial counsel is reviewed using an abuse of discretion standard. Judicial discretion is abused when the district court's action is arbitrary, fanciful, or unreasonable. The test for abuse of discretion is whether any reasonable person would take the view adopted by the district court. [Citation omitted.]

"To warrant the appointment of new trial counsel, a defendant must show 'justifiable dissatisfaction' with his or her appointed counsel. 'Justifiable dissatisfaction' may be demonstrated by showing a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between the defendant and his or her appointed attorney. [Citation omitted.]" 280 Kan. at 894.

Both the State and Kirkpatrick discuss this standard. Defense counsel, however, asked for a continuance so that Kirkpatrick could try to hire private counsel. Although Kansas courts do not appear to have discussed this specific fact scenario, other courts agree that the standard is an abuse of discretion: "The decision whether to grant a continuance based upon a desire to change or substitute

counsel rests soundly within the trial court's discretion, and the decision will not be overturned absent a showing of abuse." 17 Am. Jur. 2d, Continuance § 69.

"A sustainable exercise of discretion in deciding a motion for a continuance requires the trial court to balance carefully the presumption in favor of the defendant's right to trial counsel of choice and the public's interest in the prompt, effective, and efficient administration of justice, and given these countervailing considerations, it follows that each case must turn on its own circumstances." 17 Am. Jur. 2d, Continuance § 48.

Kirkpatrick argues that, although the abuse of discretion standard applies generally, a different standard is applicable when the claimed error implicates a federal constitutional right, such as a right to the effective assistance of counsel under the Sixth Amendment. Such an error requires a federal harmless error analysis. *State v. Lyons*, 266 Kan. 591, 592, 973 P.2d 794 (1999).

The facts of this case are analogous to two Minnesota cases. In *State v. Worthy*, 583 N.W.2d 270 (Minn. 1998), defendants requested a continuance to obtain private counsel. Although the district court appointed attorneys for defendants on April 1, 1996, the continuance was not requested until the first day of trial, May 15, 1996. The district court denied the request. In upholding the district court's decision, the Minnesota Supreme Court acknowledged the fact that the court-appointed attorneys were experienced, competent, and prepared to try the case. Additionally, the court noted that defendants did not provide the court with the name of an attorney willing to take over the case; rather, they only claimed that "family members were 'taking care of that.' " 583 N.W.2d at 278.

A case relied on by *Worthy, State v. Vance*, 254 N.W.2d 353 (Minn. 1977), also provides guidance. In *Vance*, defendant requested a continuance to secure private counsel, and the district court denied the request. In upholding the district court's ruling, the Minnesota Supreme Court stated:

"In the instant case, defendant was provided with a competent and able public defender who had thoroughly investigated the facts and was prepared for trial. He had 11 weeks to obtain private counsel but did not move for a continuance until a few days before trial. He could not be certain of securing counsel and

merely stated that someone would attempt to raise the money. Moreover he had no cause to be dissatisfied with his assigned counsel. . . . Under these circumstances, it was not error to deny the motion for a continuance." 254 N.W.2d at 359.

Like the previous cases, a review of the record in the present case indicates that the district court did not abuse its discretion in denying defense counsel's oral motion. First, as discussed above, the district court appointed defense counsel in January 2004. Kirkpatrick, however, did not seek a continuance to try to hire private counsel until over 5 months had passed, 3 days before trial. Additionally, as mentioned by the State, the jury trial was previously continued once by defendant in April 2004. As the district court noted, no charge of incompetence or inability to work with counsel was made; rather, the defendant only seemed unhappy that a plea agreement had not been reached. As the State notes in its brief, a defense attorney does not possess the power to determine what type of plea offer, if any, the State will make in a given case. Finally, Kirkpatrick did not state that another attorney was willing to take over the case, only that he and his family wanted to *try* to hire private counsel. See *People v. Segoviano*, 189 Ill. 2d 228, 245, 725 N.E.2d 1275 (2000) ("[I]t is well established that a trial court will not be found to have abused its discretion in denying a motion for substitution of counsel in the absence of ready and willing substitute counsel.").

Despite the district court's sound rationale for denying the motion, it presented Kirkpatrick with another opportunity to be heard on the issue by filing a written motion with the presiding judge. Nevertheless, Kirkpatrick failed to file a written motion for a continuance. Clearly, the court did not abuse its discretion in denying Kirkpatrick's motion for a continuance.

## WHETHER THE DISTRICT COURT DENIED KIRKPATRICK HIS RIGHT TO A FAIR TRIAL BY QUOTING THE BIBLE

Kirkpatrick contends that the district court deprived him of the right to a fair trial by quoting the Bible. Prior to opening statements, the court addressed the jury in accordance with its discre-

tionary authority contained in K.S.A. 22-3414(3) and summarized many of the introductory and cautionary instructions contained in PIK Crim. 3d 51.00. After stating that it would provide detailed legal instructions at the conclusion of the evidence to guide them, the judge further stated:

"The following admonition is gonna apply through the course of this trial. It's general rules of conduct all members of the jury are required to follow. Please keep an open and attentive mind throughout the trial. Do not make up your minds or attempt to reach a decision until the conclusion of the entire case and its submission to you for deliberations. *I like to remind the jury what's found in Proverbs 18. It says, The one who first states a case seems right until the other comes and cross-examines. There are two sides to the issue.* Please don't make up your mind until both sides have had the opportunity to present fully their case to you." (Emphasis added.)

"Judicial comments which are not instructions to the jury are reviewed under judicial misconduct standards." *State v. Brown,* 280 Kan. 65, 70, 118 P.3d 1273 (2005). In cases alleging judicial misconduct, this court's standard of review is unlimited. The question is whether Kirkpatrick's substantial rights to a fair trial were prejudiced by the court's statements. Kirkpatrick bears the burden of showing his substantial rights were prejudiced. See *State v. Miller,* 274 Kan. 113, 118, 49 P.3d 458 (2002) (analyzing a claim of judicial misconduct).

"In Kansas, the law applicable to alleged incidents of judicial misconduct is well settled. Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. Mere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial. [Citations omitted.]" *Miller,* 274 Kan. at 118.

Defense counsel did not object to the statement at trial. On appeal, however, Kirkpatrick contends that jurors would have taken a "dim view of a contemporaneous objection by defense counsel to the trial court's appeal to biblical authority."

The State argues that this court should not address the issue because it was not properly raised before the district court:

"[W]here constitutional grounds are asserted for the first time on appeal, they are not properly before the appellate court for review." *State v. Denney*, 278 Kan. 643, 651, 101 P.3d 1257 (2004). Kirkpatrick, however, asserts that review is proper despite the lack of a contemporaneous objection when the right to a fair trial is alleged to have been violated. See *Miller*, 274 Kan. at 118.

Kirkpatrick opines that by quoting a religious text, the judge "opened the door for the jurors to use the Bible as an extrajudicial source of law." In support, Kirkpatrick cites several cases from other jurisdictions including *Jones v. Kemp*, 706 F. Supp. 1534 (N.D. Ga. 1989), and *People v. Harlan*, 109 P.3d 616 (Colo. 2005). In *Jones*, a Georgia court allowed the jury to take the Bible into penalty deliberations. After a federal habeas corpus appeal, the federal district court held that it was constitutional error for the court to allow a Bible in the jury room at the request of the jurors. 706 F. Supp. at 1560. The court's conclusion stemmed from evidence that "clearly indicate[d] the members of the jury intended to use the Bible in some way or for some purposes." 706 F. Supp. at 1559. Kirkpatrick cites *Jones* for the proposition that exposing a jury to extrajudicial principles that might serve as a substitute for the trial court's instructions requires reversal, even if the effect of the exposure to those principles cannot be determined.

Similarly, in *Harlan*, the defendant was convicted of, among other things, first-degree murder. In that case, one or more jurors brought Bibles, a Bible index, and notes of Bible passages into the jury room for consideration by other jurors. In affirming the lower court's decision to vacate the defendant's death sentence, the Colorado Supreme Court held that there was a reasonable probability that the material introduced into the jury room could have influenced a typical juror to vote for a death sentence instead of life. 109 P.3d at 631. In reaching its conclusion, the court stated: "The Bible and other religious documents are considered codes of law by many in the contemporary communities from which Colorado jurors are drawn." 109 P.3d at 630. Kirkpatrick argues that because the Bible is considered a code of law by many in the Sedgwick County community from which the jury was drawn, invoking the Bible at the outset of trial prejudiced the rest of the proceedings.

In response, the State asserts that in the present case, unlike in *Jones* and *Harlan*, Kirkpatrick cannot demonstrate prejudice. Specifically, the State argues that there is no allegation that the jurors ever consulted the Bible, or had any Biblical material in the jury deliberation room. The State also cites *McNair v. State*, 706 So. 2d 828 (Ala. Crim. App. 1997), for the proposition that the existence of extraneous material does not always result in prejudice to a defendant. In *McNair*, following defendant's conviction for murder, he sought post-conviction relief. The defendant alleged that the jury improperly consulted the Bible in reaching its verdict. In affirming the denial of relief, the Alabama Court of Criminal Appeals stated:

> "We conclude, after reviewing the evidence in the instant case, that the extraneous material, i.e., reading from the Bible and praying in the jury room during deliberations, was not of such a character or nature as to indicate bias or corruption or misconduct that might have affected the verdict or as to constitute prejudice as a matter of law. We find that the appellant failed to meet his burden of making a factual showing from which it could be reasonably concluded that the jury might have been unlawfully influenced in arriving at its verdict. To hold otherwise in this case would require us to resort to pure speculation and conjecture." 706 So. 2d at 838.

In the present case, the district court should have avoided references to extrajudicial material. Even Kirkpatrick concedes that the district court's quote "correctly stated the law and was very likely well-intentioned." It does not affirmatively appear that the comment prejudiced Kirkpatrick's substantial rights. Finally, we note that the comment at issue is not inherently religious in nature. It could just as easily have been a quotation from a United States Supreme Court opinion or Abraham Lincoln. Kirkpatrick's claim is without merit.

## WHETHER THE DISTRICT COURT ERRED IN REFUSING TO RECALL THE JURY

Kirkpatrick also argues that the district court erred in denying his motion to recall the jury. Specifically, he asserts that the court's failure to conduct a full hearing on the motion violated his due process rights.

"An appellate court's review of . . . a motion to recall a jury is limited to whether the trial court abused its discretion." *State v. Jenkins*, 269 Kan. 334, 338, 2 P.3d 769 (2000). "Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. [Citation omitted.]" *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 44, 59 P.3d 1003 (2002). However, "[i]f a defendant's constitutional right has been violated during a trial, a judge's discretion to deny a motion . . . to recall a jury is limited. At this point, there is greater reason for the judge to articulate the reasons for his or her 'discretionary' decision." *Jenkins*, 269 Kan. at 338. Whether a defendant's due process rights were violated is a question of law over which this court exercises unlimited review. *Hemphill v. Kansas Dept. of Revenue*, 270 Kan. 83, 89, 11 P.3d 1165 (2000).

Recall of a jury was discussed by this court in *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842 (1987):

"Jurors may be recalled for post-trial hearings only by order of the court after a hearing on a request to recall the jury. A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order. [Citation omitted.]"

In the present case, prior to sentencing, Kirkpatrick filed a motion to recall the jurors. The motion included a sworn affidavit from John Thompson in which he stated that juror K. D., while visiting her place of employment during a break in the trial, made comments about the trial. According to Thompson, K. D. stated that "she did not know why everyone was wasting their time and that he was guilty." Thompson believed K. D.'s statements were made in a "somewhat joking manner" and were an explanation as to why she was at work. According to Thompson, K. D. did not identify Kirkpatrick or discuss details of the trial.

After a hearing on the motion, the district judge denied the request for a recall, ruling:

"Well, this by far is a very serious issue that the Court did not take lightly when I received the affidavit and the motion by defense counsel. I have done significant research on this matter.

"There's two very different principles that are being weighed in this process . . . the fact that someone has—has given an impression that they have made up their opinion as opposed to saying, This is how I'm going to vote regardless, are two different things altogether. The affidavit in this case does not rise to that latter portion. It simply says that the juror, who had heard significant evidence by that time, had formed, while arguably a preliminary conclusion as to the guilt of the defendant, does not say what view that juror had as the evidence later was presented in the next day and a half—or half day of testimony on the 13th and then the 14th, the testimony presented there and that evidence and whether that made a difference to the juror or not we don't know, and to grant the defendant's motion would be to allow the mental processes of that juror to be put into question.

"Similarly, there was no allegation and there's no suggestion that the hearer, or that the persons that the juror had made this comment to had in any way tried to influence the juror in that decision or to convince the juror that the decision should be made in such a fashion. In addition, the casual remark by the juror didn't indicate a—a personal bias by the juror against the defendant . . . .

"So for all those reasons I don't think that the defendant has met the burden of showing that there was a substantial—that there is substantial evidence that jury misconduct related to a material issue in dispute in this case; and while the conduct of the juror is not to be condoned, it's reprehensible, it's outside the admonition that the Court gave the jurors every time that they went into adjournment, it is still not sufficient to raise the—raise it to a point where we would allow the juror to be recalled in this case and questioned on the matter. So the motion to recall the juror is overruled."

In denying the motion, the district court correctly stated that jurors' mental processes are protected. The relevant statute, K.S.A. 60-441 states:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the *mental processes by which it was determined*." (Emphasis added.)

K.S.A. 60-444(a) clarifies:

"This article shall not be construed to (a) exempt a juror from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441."

This court discussed these statutes in *State v. Franklin*, 264 Kan. 496, 500, 958 P.2d 611 (1998):

" 'Under these statutes [K.S.A. 60-441 and 444(a)] we have held that a juror may not impeach his or her verdict on any ground inherent in the verdict itself; a juror may not divulge what considerations personally influenced him or her in arriving at the verdict or what reasoning personally led him or her to the final decision.' [Citations omitted.]"

Pursuant to these rules, even if K. D. and the jury had been recalled by the district court, they would have only been able to testify regarding extrinsic matters of physical facts, or occurrences of misconduct, such as K. D.'s comments made at her workplace. As the district court stated, the facts surrounding the incident were already before the court in Thompson's affidavit. See *Franklin*, 264 Kan. at 503-04 (discussing a permissible inquiry).

In denying the motion, the district court found *State v. Allen*, 4 Kan. App. 2d 534, 609 P.2d 219 (1980), to be persuasive. In *Allen*, defendant filed a motion for a new trial based on juror misconduct. In *Allen*, the jury foreman—Baker—completed a personal errand while the trial was adjourned. While running the errand, Baker spoke with three different people about the trial. Baker indicated to the first person, Mrs. Althouse, that psychiatric testimony was expected in the afternoon. Baker did not state how he would vote, and Althouse did not tell him how to vote. Nevertheless, Althouse stated that she believed Baker was going to vote guilty.

The second person Baker spoke with, Lewis Petzold, testified that Baker told him he could no longer go along with the insanity defense after hearing the confession of the defendant. According to Petzold, Baker did not state how he was going to vote and did not express any personal opinion regarding guilt. However, Petzold testified that Baker stated "[T]here had to be something more than just one human being wanting to go in and stab another human being and that there had to be some ulterior motive." 4 Kan. App. 2d at 536.

The third person that Baker spoke with, Jack Petzold, testified that he had not tried to influence Baker in any way. Nevertheless, according to Petzold, Baker stated, " '[I]t just looks to me like the man is guilty.' " 4 Kan. App. 2d at 537.

Baker testified that he had not told any of the three how he was going to vote or whether he thought the defendant was guilty. He admitted, however, that he had discussed upcoming testimony and the fact that the defendant testified that he stabbed the victim. Baker also stated that none of the three people tried to influence his opinion.

The district court ultimately denied the motion for a new trial. On appeal, a panel of our Court of Appeals stated there was a conflict as to whether Baker had made up his mind as to the defendant's guilt. However, the court noted that even if Baker had made up his mind or formed an opinion, there was no indication that his opinion was based on anything other than the evidence. 4 Kan. App. 2d at 537. The court found that Baker's conduct was clearly improper, but opined that "it is not every improper misconduct that will justify or require the granting of a new trial; and the matter is largely within the discretion of the trial court." 4 Kan. App. 2d at 537.

The *Allen* court analyzed *State v. Coburn*, 220 Kan. 743, 556 P.2d 376 (1976), for support. In *Coburn*, this court stated:

"To warrant reversal of a judgment because of improper contact or communication between a juror and an outsider, there must be some showing or indication of injury, actual or potential, to the complaining party, or the act or conduct complained of must be such as to afford reasonable grounds to question the fairness of the trial or the integrity of the verdict, or as would tend to destroy or impair public confidence in trial by jury. [Citation omitted.] The substance of the communication may be important. If the comment relates to the merits of the case, it will be more likely to be found prejudicial. *However, if it relates to the case merely in a general or incidental manner, it will more likely be found harmless.* [Citation omitted.]" (Emphasis added.) 220 Kan. at 747.

The facts in *Allen* are similar to the present case. Nevertheless, although both *Allen* and *Coburn* provide direction, they do not necessarily answer the question presented. Here, Kirkpatrick only argues that the district court erred in failing to conduct a full hearing with a recall of the jury. Absent the hearing, Kirkpatrick asserts that the district court's ruling was, at best, premature. Kirkpatrick cites *United States v. McKinney*, 429 F.2d 1019, 1026 (1st Cir. 1970), for the rule that trial courts faced with allegations of juror

misconduct must "conduct a full investigation to ascertain whether the alleged jury misconduct actually occurred." In *McKinney*, the appellate court remanded for an evidentiary hearing on the alleged juror misconduct. 429 F.2d at 1030.

Kirkpatrick also cites *United States v. Resko*, 3 F.3d 684 (3d Cir. 1993). In *Resko*, the district court learned that jurors were improperly discussing the case before the conclusion of trial. Although defense counsel wanted to individually question each juror, the district court instead opted to provide the jurors with a written questionnaire asking if they had discussed the case and if so, had they formed an opinion. All 12 jurors stated that they had discussed the case but had not formed an opinion. On appeal, the case was reversed. The appellate court concluded that the district erred by refusing to conduct further investigation into the alleged misconduct. 3 F.3d at 695.

*Resko*, however, is easily distinguishable from the present case. First, in *Resko* the district court learned that multiple members of the jury were involved in misconduct. The questionnaire revealed that *all 12 jurors* had prematurely discussed the case. In the present case, only one juror was alleged to have committed misconduct. Further, the facts surrounding the misconduct in question were before the court in the form of an affidavit from a person with firsthand knowledge of the event.

As stated previously, recall of the jury could only provide limited information. Nothing in the affidavit suggested that K. D.'s opinion was final. As the district court noted, questions of the influence of further evidence would not be allowed. It is also significant that K. D. did not identify defendant or discuss any specific facts of the case. *Cf. Allen*, 4 Kan. App. 2d at 537-38. Finally, there is no indication that K. D. shared her views with other jurors. Rather the incident at issue happened while K. D. was at her workplace. Based on the foregoing analysis, although K. D. committed misconduct, the district court did not abuse its discretion in denying Kirkpatrick's motion.

## WHETHER CUMULATIVE ERROR REQUIRES REVERSAL AND REMAND FOR A NEW TRIAL

For his last claim of error, Kirkpatrick argues that cumulative error requires reversal of his conviction and remand for a new trial.

Our standard of review of a claim of cumulative errors is well settled:

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. [Citation omitted.]' " *State v. Davis*, 283 Kan. 569, 583, 158 P.3d 317 (2006) (quoting *State v. Ackward*, 281 Kan. 2, 29, 128 P.3d 382 [2006]).

Although a couple of errors occurred during the trial, under the totality of circumstances, Kirkpatrick cannot show that he was substantially prejudiced and denied a fair trial. In addition, the evidence presented by the State was overwhelming. Therefore, reversal is not required.

Kirkpatrick's convictions are affirmed.

Nuss, J., dissenting: I respectfully dissent because of two primary concerns with the majority's treatment of its first issue: that the trial court did not err in denying Kirkpatrick's request for instructions on the lesser included offenses of voluntary and involuntary manslaughter.

First, the majority essentially has declared that K.S.A. 21-3214(1) absolutely bars a self-defense claim once *any* defendant is merely *charged* with a forcible felony, regardless of the particular facts of a case. This declaration produces absurd results, is contrary to the legislative purpose, and fails to address contrary Kansas law.

Second, the majority has declared that because Kirkpatrick's "claim of self-defense in this case was directed to the underlying felony of criminal discharge of a firearm at an occupied dwelling," imperfect self-defense cannot apply because "imperfect self-defense exists only as a lesser degree of the crime of homicide." Slip op. at 15. This declaration effectively disregards two facts: (1) that the only charge that went to the jury was felony murder, *i.e.*, a

homicide, and (2) that the requested instructions were for lesser included offenses of felony murder, *i.e.*, lesser degrees of homicide: voluntary and involuntary manslaughter.

Each concern will be discussed in turn.

1. Application of K.S.A. 21-3214(1) as interpreted by *Bell* and the majority:

The majority correctly recites K.S.A. 21-3211 (Furse) as providing:

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

The statute "is a codification of the common law right of self-defense." *State v. Stokes*, 215 Kan. 5, 9, 523 P.2d 364 (1974). Indeed, the right of self-defense has been with us since our earliest days of statehood. See, *e.g.*, *Wise v. State*, 2 Kan. 419 (1864). Referencing this statute, the majority consequently states that perfect self-defense "applies broadly to all crimes involving the use of force against another." Slip op. at 14.

The majority also correctly recites K.S.A. 21-3214(1) as providing in relevant part:

"The justification, described in sections 21-3211 [use of force in defense of a person], 21-3212 [use of force in defense of a dwelling], and 21-3213 [use of force in defense of property other than a dwelling], *is not available to a person who*: (1) Is attempting to commit, committing, or escaping from the commission of *a forcible felony* . . . ." (Emphasis added.)

The majority also correctly recites K.S.A. 21-3110(8) (Furse) to define "forcible felony" as including "*any* treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, aggravated battery, aggravated sodomy *and any other felony which involves the use or threat of physical force or violence against any person*." (Emphasis added.)

However, the majority incorrectly concludes from these statutes that regardless of the particular facts of a case, K.S.A. 21-3214(1) absolutely bars the assertion of a self-defense claim under K.S.A. 21-3211 (Furse)—and the corresponding use of a self-defense in-

struction—for all forcible felonies. It further incorrectly concludes that 21-3214(1) absolutely bars the assertion of a self-defense claim to any *charge* of a forcible felony, citing *State v. Bell,* 276 Kan. 785, 80 P.3d 367 (2003). By extension of the majority's general rationale, a defendant would also be barred from even introducing evidence of self-defense once he or she has merely been charged with a forcible felony. In my view, these conclusions are incorrect because they produce absurd results, contravene the intent of the legislature, and fail to address contrary decisions of this court.

The first absurdity is the majority's effective elimination of self-defense for most of the very crimes for which that defense was developed over the centuries. For in addition to those general categories listed in the statute, these crimes obviously also include the attempts to commit the listed felonies (*State v. Sullivan & Sullivan,* 224 Kan. 110, 578 P.2d 1108 [1978] [attempted burglary]), some lesser included offenses of the listed felonies (involuntary manslaughter based upon excessive force), and those felonies we have added through case law. See, *e.g., State v. Bell,* 276 Kan. 785 (discharge of a firearm at an occupied vehicle); *State v. Mitchell,* 262 Kan. 687, 694, 942 P.2d 1 (1997) (sale of cocaine); *State v. Ackward,* 281 Kan. 2, 128 P.3d 382 (2006) (under facts of case, attempted possession of marijuana with intent to sell). Additionally, if other felonies happen to involve "the use of threat of physical force or violence against any person" in their perpetration, they also can be included, *e.g.,* criminal threat, aggravated trafficking, aggravated sexual battery, aggravated intimidation of a witness or victim, and child abuse. See K.S.A. 21-3110(8) (Furse).

A further absurdity is evident when we acknowledge that while self-defense is no longer a valid claim for any of these violent, serious, *charged* crimes, *i.e.,* felonies, under the majority's holding self-defense would nevertheless remain valid for violent, yet less serious crimes, *e.g.,* misdemeanors. And under its holding, claims of self-defense to charged misdemeanors typically would at least be allowed to go to the trier of fact for resolution.

In reaching my conclusions, I acknowledge that where the language of a statute is clear, our normal rule is that we are bound by it. A legitimate exception exists, however, when that language leads

to absurd results. The United States Supreme Court agrees. See *Public Citizen v. Department of Justice*, 491 U.S. 440, 453, 454 n.9, 455, 105 L. Ed. 2d 377, 109 S. Ct. 2558 (1989) (despite a "straight-forward reading" of statutory language, absurd "that Members of Congress would vote for a bill subjecting their own political parties to bureaucratic intrusion and public oversight when a President or Cabinet officer consults with party committees concerning political appointments"); *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 510-11, 104 L. Ed. 2d 557, 109 S. Ct. 1981 (1989) (no matter how plain the text of Federal Rule of Evidence 609[a][1] may be, it "can't mean what it says"); *United States v. Brown*, 333 U.S. 18, 27, 92 L. Ed. 442, 68 S. Ct. 376 (1948) ("No rule of construction necessitates our acceptance of an interpretation resulting in pat-ently absurd consequences.").

Nor is the "absurd result" rule applied by only a few justices belonging to a particular school of thought. Even a "textualist" jurist like Justice Scalia has done so. See *Green v. Bock Laundry Machine Co.*, 490 U.S. at 527 ("statute, if interpreted literally, pro-duced an absurd result," thus justifying departure from the "or-dinary meaning" of word "defendant" in Federal Rule of Evidence 609[a][1]) (Scalia, J., concurring).

Justice Kennedy has addressed potential critics who might argue that this exception could constitute inappropriate judicial activity:

"[T]his narrow exception to our normal rule of statutory construction does not intrude upon the lawmaking powers of the Congress, but rather demonstrates a respect for the coequal Legislative Branch, *which we assume would not act in an absurd way*." (Emphasis added.) *Public Citizen v. Department of Justice*, 491 U.S. at 470 (Kennedy, J., concurring).

Like the United States Supreme Court, the Kansas Supreme Court has applied the "absurd result" rule for many years. See, *e.g.*, *State v. Le*, 260 Kan. 845, 850, 926 P.2d 638 (1996) ("The legislature is presumed to intend that a statue be given a reasonable construction so as to avoid unreasonable or absurd results."); *Todd v. Kelly*, 251 Kan. 512, 520, 837 P.2d 381 (1992) (same); *State ex rel. Beck v. Gleason*, 148 Kan. 1, 79 P.2d 911 (1938) (well-settled rule of construction that the letter of a statute will not be followed when it leads to an absurd conclusion).

Kansas has also applied the "contravention of the manifest purpose of the legislature" exception to plain language when, as here, the statutes are construed in pari materia. As we stated in *Todd v. Kelly,* 251 Kan. at 516:

" '[I]n order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia.* When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, *the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law.' Kansas Commission on Civil Rights v. Howard,* 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 (1975) (Emphasis added.)."

We construed several criminal statutes in pari materia in *State v. Le,* 260 Kan. at 850, and concluded: "Surely the legislature did not intend that recklessly causing the *death* of a law enforcement officer, would have a lesser penalty than reckless *aggravated battery* against a law enforcement officer." (Emphasis added.)

Whether under the "absurd result" rule or the less-popular "contravention of the manifest purpose of the legislature" rule, I believe that the majority's opinion is incorrect. Moreover, its reasoning could be characterized as circular. Here, Kirkpatrick claims that he was shooting in self-defense. However, the majority bars his claim of self-defense simply because he shot into an occupied dwelling. Yet he shot only because he was defending himself immediately after a death threat communicated by an armed Tedlock from within the dwelling. In my view, the legislature never contemplated that if a particular act of self-defense was the same act constituting the commission of the purported forcible felony, the self-defense claim would be barred, neatly clearing the way for a nearly trouble-free prosecution. See *Green v. Bock Laundry Machine Co.,* 490 U.S. at 527 ("counsel have not provided, nor have we discovered, a shred of evidence that anyone has ever proposed or assumed such a bizarre proposition": that civil defendants but not civil plaintiffs receive the benefit of weighing prejudice under the federal rules of evidence) (Scalia, J., concurring).

Stated another way, under self-defense the defendant does not contest that he or she committed the acts which typically would

constitute the crime, but argues that the commission of the otherwise criminal act was justified. Kansas law therefore considers it an affirmative defense. See *State v. Kershner*, 15 Kan. App. 2d 17, 19, 801 P.2d 68 (1990) (true affirmative defense does not serve to disprove an essential element of the crime, but merely consists of facts which might exonerate a defendant); PIK Crim. 3d 52.08. If, as here, the act of self-defense is the same act which allegedly constitutes the crime commission, then under the majority's ruling the affirmative defense of self-defense is eliminated as a matter of law.

Had the tables been turned, *i.e.*, had Tedlock felt that he needed to have shot in order to save himself and others, the majority apparently would not bar him from raising the self-defense claim—only because he had the apparent good sense, or good fortune, to shoot at someone barely outside of an occupied dwelling. Accordingly, under the majority's rationale, once Tedlock began threatening to kill Kirkpatrick, brandishing the cocked pistol and moving toward the door, Kirkpatrick had several tough choices. He could either shoot and be barred from asserting self-defense to a first-degree murder charge, or he could preserve his right to assert self-defense by waiting until Tedlock clearly stepped through the doorway and further attempted to make good on his lethal threat. The law of self-defense does not require such a choice: "If a threatened harm is such that it cannot be avoided if the intended victim waits until the last moment, the principle of self-defense must permit him to act earlier—as early as is required to defend himself effectively." 2 LaFave, Substantive Criminal Law § 10.4(d) (2d ed. 2003).

Additionally, under the majority's rationale, the following unfortunate situation could occur. If from A's house he fires multiple shots at B who is walking on the sidewalk, and to protect himself B returns fire toward A's house, killing A, then B can be charged with felony murder. The underlying felony would be the forcible felony of discharging a firearm at an occupied dwelling, and the State would successfully bar B from asserting self-defense.

In my view, these statutes are designed to bar self-defense only if the accused is *already* otherwise committing a forcible felony

when he or she commits a separate act of violence, *i.e.*, in purported self-defense. Indeed, before *Bell*, those appeared to be the cases in Kansas where the defense was barred. See *State v. Purdy*, 228 Kan. 264, 615 P.2d 131 (1980) (during residential burglary, occupant retrieves handgun and is shot by burglar; self-defense denied); *State v. Marks*, 226 Kan. 704, 707, 602 P.2d 1344 (1979) (during armed robbery of service station, proprietor strikes defendant with cane and is shot; self-defense denied).

The case of *State v. Alderson*, 260 Kan. 445, 922 P.2d 435 (1996), supports my opinion that the legislature never contemplated that if a single act of self-defense was the same act constituting the commission of the purported forcible felony, that the self-defense claim would be barred. Its facts are similar in that not only was the first-degree felony-murder charge based on the underlying felony of criminal discharge of a firearm at an occupied vehicle, but also that the act of self-defense was the very same act allegedly constituting the commission of that crime. According to defendant, while the victim drove his car circularly in a parking lot, the victim almost hit defendant's friend and was headed toward him. Defendant admitted firing two or three shots at the car; there was no dispute the victim was in the car. Defendant testified he was outside of his car and that he fired in self-defense to prevent the victim from running over him. Despite a large amount of evidence contrary to defendant's story, he was allowed to present his self-defense theory and the court instructed on the self-defense theory. Unlike the majority opinion, on appeal this court did not reach out and bar the self-defense claim or instruction as a matter of law under K.S.A. 21-3214, which would have been the easiest resolution.

The case of *State v. Sullivan & Sullivan*, 224 Kan. 110, 578 P.2d 1108 (1978), further supports my opinion. There, defendant and his brother were hiding outside a farmhouse where they had gone either to retrieve defendant's possessions taken by one of the occupants or to obtain other property items. Several occupants then opened the door to let a dog out. Defendant claimed that his shooting of one occupant was an accident because he was actually shooting at the vicious dog in self-defense. The State responded that Sullivan was involved in the commission of aggravated burglary at

the time he shot, apparently the underlying felony for his felony-murder conviction.

Although the defendant was *charged* with a forcible felony, *i.e.*, murder (see K.S.A. 21-3110[8]), unlike the majority opinion here, the *Sullivan* court did not reach out and simply apply K.S.A. 21-3214 to bar his self-defense claim. Indeed, it expressly held the trial court erred when that court gave an "instruction against self-defense" which provided: " 'Under Kansas law, the circumstances in this case are such that the defendants cannot claim the defense of self-defense, and you will not consider this as a defense.' " 224 Kan. at 124. According to the *Sullivan* court, "[T]he problem here is that the instruction . . . took from the jury the decision as to whether the defendants had completed the necessary overt act and attempted the burglary." 224 Kan. at 126. Accordingly, it reversed and remanded for the jury to decide if attempted burglary had in fact been committed.

The case of *State v. Ackward*, 281 Kan. 2, also supplies some guidance. There, a death occurred during a purported attempt to possess marijuana with intent to sell, a potential forcible felony. The trial court not only instructed on self-defense, but also instructed that a person is not justified in using force in defense if committing a forcible felony. This court held that the trial court did not err in instructing the jury on the felony-murder charge that a person is not justified in using force in defense of himself or herself if attempting to possess marijuana with intent to sell. 281 Kan. at 26. Unlike the majority opinion, on appeal the *Ackward* court did not reach out and bar the self-defense claim or instruction as a matter of law under K.S.A. 21-3214, which would have been the easiest resolution. This opinion, like *Sullivan*, suggests that it is a jury question whether self-defense could apply or if the defendant was instead committing a forcible felony.

See also *State v. Gayden*, 259 Kan. 69, 910 P.2d 286 (1996) (defendant's request for self-defense instruction in felony-murder case with attempted voluntary manslaughter as underlying felony not rejected under K.S.A. 21-3214; rather, court rejected because evidence did not support defendant's belief that shooting was nec-

essary to defend himself against victim's imminent use of unlawful force).

The majority does not address any of these Kansas Supreme Court cases in its opinion, much less attempt to reconcile them with its holding.

I also find support for my opinion in the language of K.S.A. 21-3214(2) and (3). I first emphasize that what little protection is left to the defendant who desires to claim self-defense, and who is not automatically barred by the "forcible felony" exclusion in 21-3214(1), is further reduced by these subsections. But most important to my position is the language illustrating the overall barring purpose of the statute intended by the legislature: the defendant must be the instigator, either through the initial commission of the forcible felony or of the separate act of violence.

Subsection (2) provides (assuming of course that the defendant is not charged with a forcible felony) that he or she may nevertheless be further barred from claiming self-defense if the defendant "*[i]nitially provokes the use of force against himself or another*, with intent to use such force as an excuse to inflict bodily harm upon the assailant." (Emphasis added.) K.S.A. 21-3214(2). The remainder of the statutory self-defense protection supplied by K.S.A. 21-3211 (Furse) is further reduced by subsection (3) of K.S.A. 21-3214: if he or she "*otherwise initially provokes the use of force against himself or another*," unless certain limited exceptions apply. (Emphasis added.) K.S.A. 21-3214(3).

Finally, I would point out that in *Bell*, the assertion of our new-found rule was simply an alternate basis for denying the defendant a self-defense jury instruction. *Bell*'s facts also supported the denial by the district court and that affirmation on appeal. Here, the facts are better for Kirkpatrick—as evidenced in part by the State's request for a self-defense instruction and the district court's giving of two of them. The majority opinion omits several and de-emphasizes others that I think are relevant to the inquiry.

According to Kirkpatrick, after his group returned to the apartment location, Powers came out to talk. Powers and Farha discussed the previous punching incident "like friends" to try to resolve the resultant tension. During this time that Kirkpatrick

thought everything was going well, he looked through the apartment's sliding glass door. He saw that the man who had previously lost his temper and punched Wright (Tedlock) was waving a black .45 caliber semi-automatic pistol which Kirkpatrick knew Powers kept at the house. Kirkpatrick testified that Tedlock was yelling, "Where is Tom [Wright] at? Does he want more?"

According to Kirkpatrick, he pushed Powers out of the way, walked up to the window, and told Tedlock to put the gun away, that the situation was over. Kirkpatrick told his friends that Tedlock had a gun, and Wright confirmed that he heard Kirkpatrick state that the men inside the apartment had a gun.

According to Kirkpatrick, Tedlock continued yelling and cursing. He saw Tedlock look at him, while saying, "I'll kill you," and cock the pistol by moving its slide back and then forward. Tedlock moved in the direction of the apartment's front door, which was only a couple of feet away, and within a second Kirkpatrick brought up the gun and began firing three shots because "[he] had a fear for [his] life and [his] two friends' life [sic]." Some evidence suggests that only after the door opened partly and slammed shut did Kirkpatrick actually fire at the door. Kirkpatrick testified that by shooting the door, he tried to keep Tedlock from coming outside and shooting them to death.

Other evidence confirms that Tedlock clearly had been aggressive during the first episode, which would additionally support Kirkpatrick's concern about Tedlock making good on his threat to kill him. Tedlock had followed the Kirkpatrick group out of the apartment and engaged Farha in a verbal dispute, eventually striking Wright. Tedlock also pulled out a knife and was forcibly restrained by Powers.

Other evidence also confirms that Powers kept a .45 caliber semi-automatic pistol and its accompanying magazine in his apartment. The majority accurately states that the gun—with slide pulled back and magazine well empty—and its magazine were later found by police inside snapped compartments of a guncase on a bedroom closet shelf. It is possible, however, that these placements all occurred after the shooting and after the apartment dwellers realized law enforcement would explore the apartment while re-

sponding to their 911 call. Whether Powers' gun, or any other gun besides Kirkpatrick's, had been involved in the episode was for a jury to determine.

In short, according to Kirkpatrick, only in response to perceived aggression by an armed and threatening Tedlock did Kirkpatrick shoot to defend himself and his two friends. But under the majority's mechanical application of the "*Bell* rule" interpreting K.S.A. 21-3214, the only relevant fact of this case regarding his claim of self-defense is the following: Kirkpatrick was charged with felony murder, a forcible felony. The majority automatically bars a claim of self-defense even though the act of self-defense, as in the instant case, is the very same act constituting the basis for the forcible felony: shooting to protect oneself and the lives of others. As a matter of law, the majority will not acknowledge the possibility that Kirkpatrick was not committing a felony and that he was instead legitimately defending himself.

In conclusion, in my view the majority stands more than 100 years of Kansas jurisprudence on its head. I would disapprove of the overly broad language in *Bell* and of the majority's reliance upon it to bar Kirkpatrick's assertion of self-defense. Additionally, under these facts, the district court was correct to give the self-defense instruction. See *State v. Ackward*, 281 Kan. 2, *State v. Alderson*, 260 Kan. 445. Accordingly, I would also reject the majority's holding that because Kirkpatrick was not entitled to assert self-defense that he is therefore not entitled to instructions on voluntary and involuntary manslaughter as imperfect self-defense crimes.

## 2. Imperfect self-defense only applies to degrees of homicide:

The majority has declared that "even if it had been appropriate to instruct on self-defense, it does not follow that imperfect self-defense applied to require instructions on voluntary manslaughter or involuntary manslaughter." Slip op. at 14. According to the majority, this is because Kirkpatrick's "claim of self-defense in this case was directed to the underlying felony of criminal discharge of a firearm at an occupied dwelling"—and imperfect self-defense cannot apply because it "exists only as a lesser degree of the crime

of homicide." Slip op. at 15. The majority cites 2 LaFave, Substantive Criminal Law § 10.4(i) (2d ed. 2003) and several Maryland cases for this proposition.

Even assuming that these authorities' general statements are correct, in my view the majority has stretched their reach to deny Kirkpatrick's requested instructions. Moreover, the majority's holding effectively disregards two facts that I think are important. These are: (1) the only charge that went to the jury, and that Kirkpatrick therefore defended himself against, was felony murder, *i.e.*, a homicide, and (2) the requested instructions were for "lesser degrees of the crime of homicide," *i.e.*, the lesser included offenses of felony murder—voluntary and involuntary manslaughter.

Kirkpatrick argues that his claimed self-defense would negate the criminal intent and other elements required for the underlying felony. He reasons that the evidence that the district court found strong enough to warrant a self-defense instruction necessarily makes the evidence of the underlying felony inconclusive. He properly notes that in such situations, instructions on lesser included offenses may be required. See *State v. Calvin,* 279 Kan. 193, 201-02, 105 P.3d 710 (2005). (Only when the evidence of the underlying felony is weak, *inconclusive,* or conflicting, instructions on felony murder's lesser included offenses may be required.).

As a result, because voluntary and involuntary manslaughter are lesser-included offenses of felony murder, and because they are recognized as forms of "imperfect" self-defense under Kansas law, Kirkpatrick was entitled to instructions on them. Specifically, here voluntary manslaughter is defined as the intentional killing committed upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person. PIK Crim. 3d 56.05. Involuntary manslaughter is defined here as the *unin*tentional killing during the commission of a lawful act in an unlawful manner, *e.g.*, use of excessive force while committing the lawful act of self-defense. *State v. Gregory,* 218 Kan. 180, 542 P.2d 1051 (1975); PIK Crim. 3d 56.06.

I acknowledge that Kirkpatrick argues his entitlement to these instructions by attacking the underlying felony in the felony-murder charge, first through self-defense and later through imperfect

self-defense grounds. However, this attack cannot be separated from his attack on the felony murder itself for several reasons.

First, here the charge of felony murder consists of simply two factors. They are: (1) the killing of a human being committed (2) in the commission of an inherently dangerous felony, *i.e.*, shooting at an occupied dwelling. See K.S.A. 21-3401; K.S.A. 21-4219 (Furse). Because it is uncontroverted that a human being was killed, that element cannot be attacked. Moreover, because the first-degree murder elements of premeditation and deliberation are supplied by the legislature through the commission of the inherently dangerous felony of discharging a firearm at an occupied dwelling, those elements cannot be readily directly attacked here. See *State v. Calvin*, 279 Kan. at 201-02. What remains is for Kirkpatrick to attack the commission of the underlying inherently dangerous felony.

Second, under the particular facts of this case, Kirkpatrick's attack on the underlying felony is conducted only to attack the felony murder. We know this because according to the jury instructions in the record on appeal, the only charge that went to the jury was felony murder. Two self-defense instructions were given immediately following the one on felony murder: Kirkpatrick's "perfect" self-defense and the one requested by the State under PIK Crim. 3d 54.22 (initial aggressor's use of force). Accordingly, the only *charge* to which his claims of perfect and imperfect self-defense applied was the felony murder. As a result, even if imperfect self-defense applies only to "degrees of homicide," then the only charge against Kirkpatrick—felony murder, *i.e.*, a first-degree homicide—is worthy of receiving this application.

In short, once self-defense is allowed to attack this underlying felony, it follows that he should also be allowed to use imperfect self-defense to attack the only charge against him—felony murder—and thereby receive instructions on the lesser included offenses which are manifestations of imperfect self-defense. All three crimes—felony murder and voluntary and involuntary manslaughter—are either homicides or lesser degrees of homicides.

I would reverse and remand for a new trial on these bases.

BEIER, J., joins in the foregoing dissent.

ROSEN, J., concurring: I concur with the result reached by the majority. I write separately to express my disagreement pertaining to the sweeping declaration found by the majority that bars a self-defense claim by a defendant charged with a forcible felony. I agree with the dissent's analysis and position identified as concern #1 pertaining to the application of K.S.A. 21-3214(1) as interpreted by *State v. Bell*, 276 Kan. 785, 80 P.3d 367 (2003), and the majority.

However, I agree with the majority that under the facts of this case a self defense instruction was not warranted. When Kirkpatrick returned to Powers' apartment armed with a loaded handgun and his 75- to 80-pound pit bull, pulling his gun from his waistband, he was an aggressor engaged in a number of forcible felonies, including aggravated assault. Kirkpatrick, being the initial aggressor should not have received a self-defense instruction from the trial court, thus precluding consideration of any lesser included instructions that relied on the improper inclusion of the self-defense instruction given in this case.