NOT DESIGNATED FOR PUBLICATION

No. 121,332

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL COLLINS SMITH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS M. SUTHERLAND, judge. Opinion filed October 1, 2021. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., ISHERWOOD, J., and MCANANY, S.J.

PER CURIAM: A jury convicted Michael Collins Smith of voluntary manslaughter, attempted voluntary manslaughter, aggravated child endangerment, and criminal possession of a firearm. Smith appeals, arguing that we should reverse his convictions because the trial court made multiple errors when instructing the jury. Smith further argues that we should reverse his criminal possession of a firearm conviction because it violates section 4 of the Kansas Constitution Bill of Rights. Finally, Smith contends that we should vacate his sentences and remand the case to the trial court with directions to resentence him without using his criminal history to enhance his sentences. According to

1

Smith, by relying on his criminal history to enhance his sentences, the trial court violated his common-law right to jury trial as preserved under section 5 of the Kansas Constitution Bill of Rights.

Of Smith's arguments, we find error only in the trial court's failure to instruct the jury on imperfect self-defense involuntary manslaughter as a lesser included offense of Smith's intentional first-degree murder charge for the killing of A.S. As a result, we reverse Smith's conviction for the on sudden quarrel voluntary manslaughter of A.S. under K.S.A. 2016 Supp. 21-5404(a)(1), vacate his corresponding sentence, and remand the case to the trial court for a new trial on whether Smith committed (1) an on sudden quarrel voluntary manslaughter of A.S. under K.S.A. 2020 Supp. 21-5404(a)(1) or (2) an imperfect self-defense involuntary manslaughter under K.S.A. 2020 Supp. 21-5405(a)(4). Thus, we affirm in part, reverse in part, vacate in part, and remand with directions.

FACTS

This case concerns an incident that occurred on February 2, 2017, a little after 4 in the afternoon that led to Smith's deadly shooting of A.S. Significantly, many of the facts surrounding the shooting are undisputed.

For instance, it is undisputed that the shooting occurred between the living room and kitchen inside the two-bedroom apartment that A.S. shared with his girlfriend—K.R., their three-month-old infant—K.S., K.R.'s mother—B.G., as well as K.R.'s two younger sisters. It is undisputed that aside from Smith, only A.S., K.S., and B.G. were at or near the apartment when the shooting happened. It is undisputed that a few minutes before the shooting, Smith was aware that A.S. was carrying K.S. with him around the apartment. It is uncontested that when Smith left the apartment, he fired more shots when he saw B.G., who had been talking on her cell phone near the apartment's staircase. It is undisputed that when law enforcement officers arrived at the apartment, they found A.S., who had

2

already succumbed to his six bullet wounds, lying on his back with no weapons on or near his body. And it is undisputed that when the police arrived, they also discovered K.S., who was too young to raise her own head or roll over by herself, lying next to her father's dead body. Likewise, it is uncontested that on arriving at the apartment, the police discovered evidence indicating that A.S. was involved in the illegal drug trade. For example, the police discovered a substantial amount of marijuana and over $30,000 in cash in the apartment. Lastly, it is undisputed that as of February 2, 2017, Smith owed A.S. $2,000, a sum he was supposed to have repaid to A.S. by October 2016.

Based on the events at the apartment on February 2, 2017, the State charged Smith with the intentional first-degree murder of A.S., the attempted intentional first-degree murder of B.G., and the aggravated endangerment of K.S. Because Smith's criminal history prohibited him from possessing a gun, the State also charged Smith with criminal possession of a firearm. Also, because some text messages retrieved from A.S.'s cell phone indicated that Smith wanted to buy marijuana from A.S., the State charged Smith with using a communication facility to engage in a drug crime.

*Smith's jury trial*

Smith's jury trial on the preceding charges occurred between February 11, 2019, and February 15, 2019. At trial, the State's case against Smith hinged on its assertion that Smith committed intentional first-degree murder by shooting A.S. six times as he held K.S. in his arms. Although not entirely clear, it seems the State believed that Smith committed a premeditated shooting as he and A.S. attempted to complete a drug deal inside the apartment. It supported this theory by pointing to the text messages retrieved from A.S.'s cell phone indicating that Smith wanted to buy marijuana from A.S. The State's case further hinged on its contention that after intentionally murdering A.S., Smith tried to intentionally kill B.G. when he was leaving the apartment.

3

On the other hand, Smith's case hinged on his contention that he went to the apartment on February 2, 2017, to discuss his $2,000 debt, but those discussions quickly became heated when A.S. realized that Smith could not repay the debt. Although Smith admitted that he technically possessed a firearm, he denied intending to kill A.S., intending to kill B.G., recklessly causing the endangerment of K.S., being a criminal in possession of a firearm, or wanting to buy marijuana from A.S. He instead insisted that he had to shoot A.S. in self-defense because A.S. was actively trying to kill him with a handgun that he ultimately gained control of and then used to kill A.S. He argued that because A.S. was trying to kill him, he never noticed if A.S. was holding K.S. in his arms as he fired the gun. For this reason, as well as his self-defense claim against A.S., Smith argued that the jury should acquit him of endangering K.S. Additionally, he argued that because he believed that B.G. was trying to shoot him with a black handgun that he had earlier seen on the apartment's kitchen counter, he acted in self-defense when he fired "warning shots" towards B.G. as he left the apartment. Of note, Smith's contention that there was a black handgun on the apartment's kitchen counter when he initially entered the apartment on February 2, 2017, was a central part of his defense.

*The State's evidence*

To support its case, the State primarily relied on the testimony of B.G. During her testimony, B.G. denied that there was a black handgun located on the kitchen counter when Smith initially entered the apartment on February 2, 2017. She alleged that to her knowledge, there were no "gun[s] anywhere hanging out in the apartment." So she also denied trying to shoot Smith as he left the apartment.

As for the events leading up to the shooting, B.G. explained that Smith knocked on the apartment door a little before 4 p.m. on February 2, 2017. B.G. explained that although she did not know that Smith was coming over to the apartment that afternoon, she was familiar with him because Smith, who was a barber, had previously trimmed

4

A.S.'s hair at the apartment. She also testified that once Smith entered the apartment, Smith and A.S. went into the master bedroom.

According to B.G., after Smith and A.S. went into the master bedroom, she went into the apartment's other bedroom so she could talk on her cell phone. But B.G. explained that she remained in this bedroom for only a few minutes because she decided to continue her cell phone conversation outside the apartment. Also, she explained that as she departed the apartment, Smith was once again entering the apartment. She testified that as Smith reentered the apartment, he was carrying a black bag.

Next, B.G. testified that she continued to talk on her cell phone after leaving the apartment. She testified that not long after Smith reentered the apartment, though, she heard five or six rapid gunshots come from inside the apartment. B.G. explained that when she heard the gunshots, she looked towards the apartment door. At that point, she saw Smith hurriedly leaving the apartment. She further testified that once Smith noticed her, Smith aimed a gun at her and started shooting.

B.G. testified that when Smith started shooting at her, she dropped her cell phone, started running, and then hid behind a car in the apartment parking lot. She testified that Smith shot at her five to six times in total, with one bullet making a hole in her sweatshirt as it grazed her right arm. The State introduced photos that showed a hole in the right arm of B.G.'s sweatshirt. B.G. then explained that after Smith drove off, she went to a neighbor's apartment and called 911 for help.

In addition to B.G.'s testimony, the State called law enforcement officers, forensic scientists, and crime scene analysts who investigated the apartment shooting to support its case. The law enforcement officers who initially responded to B.G.'s 911 call all testified that they could hear K.S. crying very loudly inside the apartment before they entered it. They all explained that when they entered the apartment shortly after

4:15 p.m., K.S. was lying face-down on her stomach within arm's reach of her father's body. Meanwhile, the State's forensic biologist testified that A.S.'s blood created the blood stain found on K.S.'s clothing.

On the search of the apartment immediately following the shooting, one officer explained that he found a holstered black Smith and Wesson handgun in the master bedroom. The primary crime scene investigator assigned to the case, Amy Santoro, testified about finding ballistics related evidence, which included the following: (1) four spent bullets immediately above the concrete subfloor under A.S.'s body between the apartment's living room and kitchen area, (2) one spent bullet under K.S.'s baby bouncer in the apartment's living room, (3) one spent bullet in A.S.'s left shoulder, and (4) one spent bullet in the apartment's parking lot. According to Santoro, this final spent bullet was located under one of the two cars in the apartment's parking lot with evidence of gunshot damage. Santoro as well as multiple officers also testified about the discovery of five shell casings inside the apartment and three shell casings in the apartment's parking lot.

About the specific features of the spent bullets and casings recovered, Santoro explained that the characteristics of the four spent bullets recovered immediately above the concrete subfloor under A.S.'s body and the single spent bullet found under the car in the apartment's parking lot showed that Smith fired those bullets with a downward trajectory. Also, the State's ballistics expert testified that based on his review of the shell casings recovered from the apartment and the apartment parking lot, he believed that all the recovered shell casings were fired from the same gun. His testing also eliminated the holstered Smith and Wesson handgun found in the apartment's master bedroom from firing the shell casings recovered from the apartment and the apartment parking lot.

As for A.S.'s gunshot wounds, Dr. Michael S. Handler, the forensic neuropathologist who completed A.S.'s autopsy, testified that A.S. had six gunshot

6

wounds to his body that he believed were caused by six distinct gunshots. Dr. Handler specifically testified that those six gunshot wounds to A.S. were as follows: (1) a wound caused by a bullet that entered A.S.'s left chest and exited A.S.'s right chest with a "front to back, left to right, and horizontal" trajectory; (2) a wound caused by a bullet that entered A.S.'s lower right abdomen and exited A.S.'s lower right side with a "front to back, left to right, and upward" trajectory; (3) a wound caused by a bullet that entered A.S.'s left, middle back and exited his right abdomen with a "left to right, back to front, and downward" trajectory; (4) a wound caused by a bullet that entered A.S.'s groin area and exited his left buttocks with a "front to back, right to left, and horizontal" trajectory; (5) a wound caused by a bullet that entered A.S.'s left shoulder and never exited with a "left to right, upward, and slightly forward" trajectory; and (6) a wound cause by a bullet that entered and then exited A.S.'s left hand with an "upward" trajectory. Relatedly, the State's blood pattern expert testified that the absence of blood staining on A.S.'s abdomen meant that A.S. was primarily in a nonupright position when Smith shot him.

Finally, in addition to the preceding evidence, the State successfully admitted a recording of a telephone conversation between Smith and another person on February 6, 2017, that occurred while Smith was in jail following his arrest. During this phone conversation, Smith stated that A.S. "pull[ed] a weapon out with a baby in his hands." When the person Smith was speaking to questioned him on this, Smith repeated that A.S. was "holding the kid when he pulled the gun out."

*Smith's evidence*

To support his case, Smith mainly relied on his own testimony. Indeed, outside of a friend's testimony about having a normal conversation with Smith a few hours before the apartment shooting on February 2, 2017, Smith's testimony was the only evidence supporting his claims of self-defense.

7

Smith testified that he went over to the apartment around 4 p.m. on February 2, 2017, to talk to A.S. about his $2,000 debt. According to Smith, he wanted to discuss loan repayment options with A.S. because the previous week A.S. had told him the final deadline to repay his debt was February 3, 2017. Smith explained that although A.S. did not say what he would do to him if he did not repay the debt by February 3, 2017, he knew that A.S. had a reputation for a short temper. He noted that A.S. had previously been in an altercation, which ended with A.S. being "shot in the face." Smith therefore wanted to figure out some sort of repayment plan before the deadline to avoid upsetting A.S. despite not having enough money to repay the debt. On the repayment plan, Smith testified that in addition to being a barber, he was a comedian. He explained that he was hoping that A.S., who was an aspiring rapper, would allow him to repay the debt by selling A.S.'s music at his comedy shows. He also explained that he was hoping that A.S. would accept his video camera and laptop computer as partial repayment for the loan.

As for what happened next, Smith testified that when he arrived at the apartment, A.S. answered the door and immediately asked him if he had his barber tools with him because he wanted his hair trimmed. Smith stated that after telling A.S. that he could trim his hair, he returned to his car, retrieved his barber tools, and retrieved the video camera that he hoped A.S. would accept as partial repayment for his $2,000 debt. Smith alleged that his barber tools were inside a beige bag, which he carried into the apartment. Although Smith denied returning to his car to retrieve a gun, he alleged that once he actually entered the apartment after retrieving his barber tools and video camera, he noticed that there was a black handgun on the kitchen counter. When asked if the presence of the black handgun concerned him at all, Smith testified that it did not because it was not "unusual" for guns to be "out" in the apartment.

Smith testified that after he entered the apartment, he and A.S. went into the master bedroom, where he assumed he would be trimming A.S. hair. Yet, he testified that he never started trimming A.S.'s hair because as soon as they went into the master

8

bedroom, A.S. started complaining about his debt. Smith alleged that it was at this point, A.S. became angrier with him about his inability to repay his loan. He explained that as A.S.'s anger increased, he saw B.G. leave the apartment while talking on her cell phone. And he stated that shortly after he saw B.G. do this, he also exited the apartment so he could retrieve his laptop from his car. Smith seemed to hope A.S. would calm down when he realized Smith had also brought the laptop as partial payment for his debt.

But Smith testified that when he returned to the apartment with his laptop, which was itself inside a black or brown satchel, B.G. requested to search his satchel before allowing him to reenter the apartment. He stated that immediately after B.G. did this and he reentered the apartment, though, A.S. approached him with a gun. He testified that A.S. then put a gun up against his head and said, "[I]t's been six months, you got my money. You think I am stupid? You are trying to play me. . . . I don't need no fucking MacBook Pro. I got a MacBook Pro. I don't need no video. I need my money."

According to Smith, on reentering the apartment, he never noticed if K.S. was in the living room area because he was completely focused on the fact that A.S. had a gun against his head. Also, according to Smith, when A.S. put the gun against his head, he reacted by putting his hands in the air. Yet, Smith testified that as he put his hands in the air, he was able to twist A.S.'s gun downward so that a brief struggle over the gun ensued. He testified that at the conclusion of this brief struggle, he and A.S. were standing upright with A.S.'s back to his chest as he held the gun in his left hand. He stated that once they were in this position, he kicked A.S. forward and attempted to shoot him in the buttocks but instead shot him in the back.

Smith testified that following this first gunshot, A.S. fell to the ground. Then A.S. attempted to drag him to the ground as well by pulling on his satchel. He further testified that as A.S. tried to drag him to the ground, A.S. continued threatening to kill him. Smith testified that it was at this point, he shot A.S. in the left shoulder. Then, he testified that

9

because A.S. continued to pull on his satchel, he decided to shoot A.S. until he let go of his satchel. When asked why he did not leave after firing the first two gunshots, Smith explained that he did not leave because "[they] weren't done." Also, Smith testified that it was not until after A.S. let go of his satchel that he realized that the gun in his hands was not the black handgun he had seen earlier on the apartment's kitchen counter. Instead, he explained it was then that he realized he was holding a silver handgun that he had never seen before.

Smith contended that after A.S. let go of his satchel, he ran outside to tell B.G. to call 911. Smith testified, however, that when he departed the apartment, B.G. dropped her cell phone and reached for something, which he believed was the black handgun missing from the apartment's kitchen counter. He testified that because he believed that B.G. was trying to shoot him with the missing black handgun, he fired a "warning shot" "ahead, and kind of to the right" into a car windshield to scare B.G. away. He also testified that as B.G. ran away from him following this first warning shot, he shot the gun once in B.G.'s direction before firing more shots off into the air. He indicated that he thought he needed to shoot the gun in B.G.'s direction because B.G. had run off to his left and his car was also parked to his left.

Smith testified that after doing this, he got into his car and drove off before briefly returning to the apartment to retrieve his barber tools, video camera, and laptop. He explained that once he left the apartment this time, he did not return. Instead, he conceded that after leaving the apartment this final time, he tossed the silver handgun in a dumpster before spending the night at a girlfriend's house and turning himself into law enforcement the next day—February 3, 2017.

During his cross-examination, Smith made other concessions. He conceded that he sustained no injuries from his alleged struggle with A.S. over the silver handgun. He conceded that he never checked on either A.S.'s or K.S.'s well-being after the shooting.

10

He conceded that he never called 911 so emergency services could quickly address A.S.'s gunshot wounds. Although he still denied seeing K.S. in the apartment's living room or kitchen area, he conceded that when he returned to the apartment to retrieve his barber tools, video camera, and laptop, he could hear K.S. crying. And he conceded that when he returned to the apartment, he went back into the kitchen specifically because "that's where [his] satchel and [his] video camera was." When the prosecutor asked him if he returned to the apartment after shooting A.S. to steal some of the marijuana and cash located in the apartment's master bedroom, Smith denied returning to the apartment for this purpose.

*Jury instruction conference*

At the jury instruction conference, the trial court granted Smith's request to instruct the jury on attempted intentional second-degree murder and imperfect self-defense attempted voluntary manslaughter as lesser included offenses of his attempted intentional first-degree murder charge for the attempted killing of B.G. The trial court also granted Smith's request to instruct the jury on intentional second-degree murder and voluntary manslaughter on sudden quarrel as lesser included offenses to his intentional first-degree murder charge for the killing of A.S. But it denied Smith's request to instruct the jury on imperfect self-defense involuntary manslaughter as stated under K.S.A. 2016 Supp. 21-5405(a)(4) as a lesser included offense of his intentional first-degree murder charge for the killing of A.S. Also, over Smith's objection, the trial court granted the State's request to give a forcible felony instruction regarding the evidence indicating Smith might have been involved in a marijuana sale when the shooting occurred.

*Verdicts*

In the end, the jury acquitted Smith of using a communication facility to commit a drug crime. But it convicted Smith of the aggravated endangerment of K.S. and criminal

possession of a firearm. Also, it found Smith guilty of the on sudden quarrel voluntary manslaughter of A.S. and the imperfect self-defense attempted voluntary manslaughter of B.G.

*Sentencing*

At sentencing, for each of his crimes, the trial court sentenced Smith to the standard presumptive sentence under the revised Kansas Sentencing Guidelines Act (KSGA) based on his criminal history score of A. It also ran each of Smith's sentences consecutive. As a result, the trial court imposed on Smith a total controlling sentence of 279 months' imprisonment followed by 36 months' postrelease supervision.

Smith now timely appeals his convictions and sentences.

ANALYSIS

*Did the trial court err when instructing the jury?*

In his primary argument on appeal, Smith contends that the trial court erred when it instructed the jury in multiple ways: First, Smith asserts that the trial court should have instructed the jury on imperfect self-defense. In particular, he argues that the trial court erred when it denied his request to instruct the jury on imperfect self-defense involuntary manslaughter as a lesser included offense of his intentional first-degree murder charge for the killing of A.S. And although he never requested the instruction, he argues that the trial court clearly erred when it failed to instruct the jury on imperfect self-defense attempted involuntary manslaughter as a lesser included offense of his attempted intentional first-degree murder charge for the attempted killing of B.G. Second, Smith asserts that the trial court clearly erred when it gave the jury a forcible felony instruction, which stated that the jury must reject his self-defense claims if it believed that he used force to defend himself while selling marijuana or aiding in the sale of marijuana. Third,

Smith contends that the trial court clearly erred when it failed to instruct the jury on misdemeanor child endangerment as a lesser included offense of his aggravated child endangerment charge for endangering K.S.

*Standard of review*

When considering jury instruction issues, this court employs a three-step review process: First, this court must determine whether "'there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018). Second, if this court concludes that the jury instruction issue is properly before it, this court must consider whether an error actually occurred by determining whether the disputed instruction was legally and factually appropriate. Third, if this court determines that the disputed instruction was both legally and factually appropriate, this court must consider whether the jury instruction error can be deemed harmless. 307 Kan. at 317.

Importantly, under the second step of the review process, this court must consider whether the disputed jury instruction was both legally and factually appropriate based on an unlimited review of the entire record. 307 Kan. at 318. Yet, this court evaluates whether a defendant's requested instruction was factually appropriate by analyzing whether the evidence supported giving the instruction when viewed in the light most favorable to the defendant. *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016). Also, when considering challenges involving lesser included offense instructions, the trial court has a duty to give a defendant's requested lesser included offense instruction as long as "some evidence" supports giving the instruction. See *State v. Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014). Thus, a trial court errs by denying a defendant's requested lesser included offense instruction if, when viewed in the light most favorable to the defendant, some trial evidence supported giving the instruction.

13

Meanwhile, under the third step of this court's review process, the applicable harmlessness test depends on whether the defendant requested or objected to the giving of the disputed instruction before the trial court. If the defendant made the jury instruction argument below, the court must apply the test and applicable degree of certainty set forth in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011). *State v. Louis*, 305 Kan. 453, Syl. ¶ 1, 384 P.3d 1 (2016). If the defendant is raising the jury instruction argument for the first time on appeal, however, the defendant must establish that the instruction error was clearly erroneous. This means that the defendant must firmly convince this court that the jury would have reached a different verdict but for the instruction error. *McLinn*, 307 Kan. at 318. So under the first step of this court's three-step review process, a defendant's failure to raise his or her jury instruction argument before the trial court does not prevent this court from considering the merits of the defendant's jury instruction argument on appeal. Instead, a defendant's failure to raise his or her jury instruction argument below merely affects this court's reversibility inquiry under the third step. 307 Kan. at 317.

Finally, to the extent Smith's jury instruction arguments also involve statutory construction issues, statutory interpretation is a question of law over which we exercise unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019). In contrast, to the extent Smith's jury instruction arguments also involve sufficiency of the evidence issues, when considering such arguments, we must determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt when viewing all the evidence in the light most favorable to the State. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

*Imperfect self-defense instructions*

K.S.A. 2020 Supp. 21-5222(a) states that "[a] person is justified in the use of force against another when and to the extent it appears to such person and such person

14

reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force." Also, under K.S.A. 2020 Supp. 21-5222(b), a person may use deadly force against another when and to the extent it appears to such person and "such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." As a result, K.S.A. 2020 Supp. 21-5222 provides that on another person's imminent use of unlawful or deadly force, a person may respond by using equal force to defend himself or herself. But per K.S.A. 2020 Supp. 21-5222's plain language, the person acting in self-defense must also "reasonably believe" that using such force was necessary for his or her protection.

In the past, our Supreme Court has explained that the type of self-defense described under K.S.A. 2020 Supp. 21-5222(a)-(b) is "perfect self-defense." See *State v. Kirkpatrick*, 286 Kan. 329, 339, 184 P.3d 247 (2008), *abrogated on other grounds by State v. Barlett*, 308 Kan. 78, 418 P.3d 1253 (2018). When properly invoked by a defendant, "[p]erfect self-defense is a concept based on justification or excuse and operates as a complete defense." 286 Kan. at 339. Also, a defendant may argue perfect self-defense in response to "all crimes involving the use of force against another." 286 Kan. at 339.

Nevertheless, in addition to perfect self-defense, our Supreme Court has recognized that a defendant may argue imperfect self-defense. "Imperfect self-defense . . . is based not on justification, but on mitigation and, thus, operates only to reduce criminal culpability to a lesser crime." 286 Kan. at 339. This means that "[i]mperfect self-defense is 'not a true defense; it does not absolve a defendant of criminal liability. It is, rather, a lesser degree of the crime of homicide.'" 286 Kan. at 339. As a result, "[i]mperfect self-defense exists only as a lesser degree of homicide in voluntary manslaughter . . . and in involuntary manslaughter." 286 Kan. at 339. Specifically, imperfect self-defense exists as a lesser degree of homicide in voluntary manslaughter

15

under K.S.A. 2020 Supp. 21-5404(a)(2), which is the knowing killing of a human being "upon an unreasonable but honest belief that circumstances existed that justified use of deadly force." And it exists as a lesser degree of homicide in involuntary manslaughter under K.S.A. 2020 Supp. 21-5405(a)(4), which is the killing of a human being committed "during the commission of a lawful act in an unlawful manner."

As a result, although perfect self-defense is a complete defense, imperfect self-defense is not. It merely allows the defendant to argue that he or she is guilty of voluntary manslaughter or involuntary manslaughter as opposed to first-degree or second-degree murder because the victim's initial aggression justified the use of some force in self-defense. Yet, by arguing imperfect self-defense, a defendant also necessarily concedes that the ultimate killing of the victim was illegal. That is to say, by arguing imperfect self-defense, the defendant alleges that the victim's initial aggression warranted a response in self-defense but at the same time concedes that the ultimate force he or she inflicted on the victim in self-defense was excessive under the facts of the case. See *State v. James*, 309 Kan. 1280, 1302, 443 P.3d 1063 (2019).

Also, it is important to note that although the elements of imperfect self-defense voluntary manslaughter and imperfect self-defense involuntary manslaughter seem similar, *the key difference between the two statutes is whether the defendant ever had a valid self-defense claim*. A defendant who has committed an imperfect self-defense voluntary manslaughter under K.S.A. 2020 Supp. 21-5404(a)(2) never had a valid self-defense claim. Instead, although that defendant honestly believed that he or she needed to use deadly force, that defendant's conduct was criminal because it was an unreasonable belief. Conversely, a defendant who has committed imperfect self-defense involuntary manslaughter under K.S.A. 2020 Supp. 21-5405(a)(4) originally had a valid self-defense claim but during the altercation with the victim ultimately used excessive force. Hence, the defendant engaged in a lawful act—self-defense—but engaged in this lawful act in an unlawful manner—excessive force.

As previously mentioned, during the jury instruction conference, Smith did not ask the trial court to instruct the jury on imperfect self-defense attempted involuntary manslaughter as a lesser included offense of his attempted intentional first-degree murder charge for the attempted killing of B.G. Smith did, however, ask the trial court to instruct the jury on imperfect self-defense involuntary manslaughter as a lesser included offense of his intentional first-degree murder charge for the killing of A.S. But the trial court denied this request by relying on *State v. Bailey*, 263 Kan. 685, 691, 952 P.2d 1289 (1998), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006). It concluded that the facts of Smith's case were comparable to Bailey's case—a case where our Supreme Court affirmed the trial court's refusal to instruct on *reckless involuntary manslaughter* as a lesser included offense of intentional first-degree murder because the trial evidence indicated that Bailey killed the victim intentionally. *Bailey*, 263 Kan. at 688-91.

Now, on appeal, Smith argues that the trial court committed reversible error when it failed to instruct the jury on imperfect self-defense involuntary manslaughter as a lesser included offense of his intentional first-degree murder charge for the killing of A.S. and imperfect self-defense attempted involuntary manslaughter as a lesser included offense of his attempted intentional first-degree murder charge for the attempted killing of B.G. Smith begins his analysis by taking issue with the trial court's reliance on *Bailey* to deny his imperfect self-defense involuntary manslaughter of A.S. instruction request. He argues that the trial court's reliance on *Bailey* was misplaced because the *Bailey* decision did not involve an imperfect self-defense jury instruction issue. He then stresses that the trial court had a duty to instruct the jury on all lesser included offenses he had requested for which there was some evidence to support his conviction. And he contends that his case is comparable to this court's recent decision in *State v. Pulliam*, 308 Kan. 1354, 1369-70, 430 P.3d 39 (2018), where our Supreme Court held that the trial court erred by not instructing the jury on imperfect self-defense involuntary manslaughter. Based on this

comparison, Smith argues that the trial court had to give the jury the disputed imperfect self-defense instructions.

The State responds that although both instructions were legally appropriate, the trial court did not err by failing to give either the imperfect self-defense involuntary manslaughter or the imperfect self-defense attempted involuntary manslaughter instructions because neither instruction was factually appropriate. See *Pulliam*, 308 Kan. at 1362 (noting that both voluntary manslaughter and involuntary manslaughter are lesser included offenses of first-degree murder). Although not entirely clear, it seems the State believes that the instruction on imperfect self-defense involuntary manslaughter as a lesser included offense of Smith's intentional first-degree murder charge for the killing of A.S. was factually inappropriate because by convicting him of voluntary manslaughter, the jury must have believed Smith's testimony about A.S. threatening his life while putting a gun against his head. Thus, according to the State, "there was no factual scenario" in which the jury could have found Smith's "use of deadly force was excessive" as to warrant the imperfect self-defense involuntary manslaughter instruction. Alternatively, the State argues that we should affirm Smith's voluntary manslaughter of A.S. conviction because any error stemming from the trial court's refusal to instruct the jury on imperfect self-defense involuntary manslaughter as a lesser included offense was harmless "[f]or the same reason that the instruction was not factually appropriate."

As for Smith's argument that the trial court erred by not instructing the jury on imperfect self-defense attempted involuntary manslaughter as a lesser included offense of his attempted intentional first-degree murder charge for the attempted killing of B.G., the State asserts that this instruction was also factually inappropriate. It contends that under the trial evidence presented, the jury had to either accept or reject Smith's self-defense claim as it pertained to B.G. And it once again alternatively argues that we should affirm Smith's attempted voluntary manslaughter of B.G. conviction because any error

18

stemming from the trial court's failure to give the disputed instruction was harmless "[f]or the same reason that the instruction was not factually appropriate."

*Imperfect self-defense involuntary manslaughter*

As just noted, the State's analysis why Smith's requested instruction on imperfect self-defense involuntary manslaughter was factually inappropriate seemingly hinges on its contention that the jury must have believed Smith's testimony about A.S. threatening his life while putting a gun against his head given its decision to convict Smith of the voluntary manslaughter of A.S. It seems the State believes that because the jury convicted Smith of the voluntary manslaughter of A.S., the jury would never have convicted Smith of the imperfect self-defense involuntary manslaughter of A.S. even if it had been given this option.

But how the jury may have interpreted the evidence is not the proper inquiry at this stage of this court's review process. Instead, when considering whether a disputed lesser included offense instruction is factually appropriate, both the trial court and this court must review whether *some evidence* supports giving the instruction. See *Armstrong*, 299 Kan. at 432. So despite the State's apparent argument otherwise, the jury's thought-process during deliberations has no bearing on the factual appropriateness of Smith's requested instruction on imperfect self-defense involuntary manslaughter as a lesser included offense of his intentional first-degree murder charge for the killing of A.S.

Also, Smith's complaint about the trial court's reliance on *Bailey* to deny his request for an instruction on imperfect self-defense involuntary manslaughter has merit. When it denied Smith's request for an instruction on imperfect self-defense involuntary manslaughter, the trial court explained that it was relying on the *Bailey* decision to deny the request because "[i]n that case, [our Supreme] Court reasoned that a defendant's actions in pointing a gun at an individual and pulling the trigger are intentional rather

than reckless." Clearly, however, the trial court's reliance on *Bailey* was misplaced because as argued by Smith, the *Bailey* decision involved the trial court's refusal to give a reckless involuntary manslaughter instruction, not an imperfect self-defense involuntary manslaughter instruction. 263 Kan. at 691. Thus, the trial court's sole justification for denying Smith's imperfect self-defense involuntary manslaughter instruction request was erroneous.

Most importantly, though, Smith's reliance on *Pulliam* and the argument that some evidence supported the factual appropriateness of his imperfect self-defense involuntary manslaughter instruction request is persuasive.

In *Pulliam*, our Supreme Court held that the trial court erred when it failed to instruct the jury on imperfect self-defense involuntary manslaughter as a lesser included offense to intentional second-degree murder simply because Pulliam had testified that "he heard a gun cock and thought that he was about to be shot in the back" by the victim. 308 Kan. at 1369. Our Supreme Court explained the trial court had to instruct the jury on imperfect self-defense involuntary manslaughter because Pulliam's testimony constituted some evidence that he had a valid claim of self-defense against the victim but ultimately used excessive force by shooting the victim three or four times. 308 Kan. at 1369. Also, in reaching this holding, our Supreme Court explained that it was irrelevant whether other evidence, like Pulliam's previous statement to a detective, contradicted Pulliam's trial testimony about the victim being the initial aggressor. 308 Kan. at 1369.

Thus, the *Pulliam* decision establishes that even when only the defendant's conflicting testimony supports giving an imperfect self-defense involuntary manslaughter instruction, the defendant's conflicting testimony constitutes some evidence requiring the trial court to instruct the jury on imperfect self-defense involuntary manslaughter as a lesser included offense. As applied to this case, this means that the trial court should have instructed the jury on imperfect self-defense involuntary manslaughter under K.S.A. 2016

Supp. 21-5405(a)(4) as a lesser included offense to Smith's intentional first-degree murder charge for the killing of A.S. *as long as there was some evidence, even if that evidence was just Smith's conflicting testimony, indicating that A.S.'s initial aggression permitted Smith to react in self-defense but that Smith's ultimate use of force against A.S. in self-defense was excessive.* See *James*, 309 Kan. at 1302. Here, not only did Smith's testimony constitute some evidence that he committed the imperfect self-defense involuntary manslaughter of A.S., but also his testimony about A.S. being the initial aggressor was far more detailed, consistent, and convincing than Pulliam's testimony about hearing the victim cock a gun.

To review, Smith testified that he went over to the apartment on February 2, 2017, to talk to A.S. about potential repayment options for his $2,000 debt. He testified that after he entered the apartment with his barber tools, he noticed a black handgun on the kitchen counter. He testified that as soon as he and A.S. entered the master bedroom where he normally trimmed A.S.'s hair, A.S. became increasingly angrier about his inability to repay his debt, which resulted in him leaving the apartment to retrieve his laptop from his car to offer it as partial repayment for this debt. Also, he testified that as soon as he reentered the apartment with his black satchel containing the laptop, A.S. put a gun up against his head while stating: "[I]t's been six months, you got my money. You think I am stupid? You are trying to play me. . . . I don't need no fucking MacBook Pro. I got a MacBook Pro. I don't need no video. I need my money."

Even so, Smith also explained that after he gained control of A.S.'s gun following a short struggle, he shot A.S. a total of six times. He testified that immediately after he gained control of the gun, he attempted to shoot A.S. in the buttocks, but instead shot A.S. in the back as he kicked A.S. forward. He explained that he then shot A.S. in the left shoulder because A.S., who was now lying on the floor, was pulling on his black satchel, attempting to drag him onto the floor as well. He explained that after shooting A.S. the second time, he decided to shoot A.S. until A.S. let go of his black satchel. When asked

21

why he did not leave after shooting A.S. the second time, Smith explicitly stated that after shooting A.S. twice, he continued to shoot him because he and A.S. "weren't done."

In summary, Smith clearly testified that A.S. was the initial aggressor during their altercation inside the apartment on February 2, 2017. Because Smith testified that A.S. cursed at him as he put a gun against his head, some evidence supported Smith's claim of self-defense against A.S. As a result, the trial court needed to instruct the jury on perfect self-defense as stated under K.S.A. 2016 Supp. 21-5222(a)-(b). But at the same time, because Smith testified about shooting A.S. a total of six times, including five times after A.S. was already lying on the floor of the apartment suffering from his first gunshot wound, some evidence also supported Smith's claim of imperfect self-defense involuntary manslaughter.

In fact, according to Dr. Handler's trial testimony, Smith's very first gunshot at A.S. pierced A.S.'s liver and was fatal absent quick medical intervention. Thus, some evidence supported that all but one of Smith's six gunshots into A.S.'s body were literal overkill. And notwithstanding this, there is certainly a strong argument that after Smith gained control of the gun, shot A.S. through the liver, *and* shot A.S. through the left shoulder, A.S. no longer posed an imminent danger to Smith even if A.S. continued to grasp hold of his black satchel. So at minimum, some evidence supported that Smith's final four gunshots into A.S.'s body were excessive. As a result, the trial court should have instructed the jury on imperfect self-defense involuntary manslaughter as a lesser included offense of Smith's intentional first-degree murder charge for the killing of A.S.

Because the trial court erred when it denied Smith's request to instruct the jury on imperfect self-defense involuntary manslaughter as a lesser included offense of his intentional first-degree murder charge for the killing of A.S., we must consider whether the trial court's error was harmless. Recently, in *State v. Becker*, 311 Kan. 176, Syl. ¶ 4, 459 P.3d 173 (2020), our Supreme Court held that in noncapital cases, the trial court's

22

"failure to instruct on a lesser included offense does not impair a defendant's constitutional right to a trial by jury or right to due process." So the trial court's instructional error did not infringe upon Smith's constitutional rights. For us to uphold Smith's voluntary manslaughter conviction for the killing of A.S., we must determine whether there is a reasonable probability that the trial court's failure to instruct the jury on imperfect self-defense involuntary manslaughter as a lesser included offense of his intentional first-degree murder charge for the killing of A.S. affected the outcome of Smith's trial in light of the entire record. See *Ward*, 292 Kan. 541, Syl. ¶ 6; K.S.A. 2020 Supp. 60-261. Also, as the party benefiting from the instruction error, the State carries the burden of establishing harmlessness. See *State v. De La Torre*, 300 Kan. 591, 609, 331 P.3d 815 (2014) (holding that party benefiting from error carries burden to demonstrate harmlessness regardless of whether constitutional harmless error test or nonconstitutional harmless error test under K.S.A. 60-261 applies).

But the entirety of the State's harmlessness argument is that any error stemming from the trial court's failure to instruct the jury on imperfect self-defense involuntary manslaughter was harmless "[f]or the same reason that the instruction was not factually appropriate." As explained in the preceding paragraphs, though, the instruction was factually appropriate based on Smith's testimony. Thus, the State's sole argument as to why the trial court's failure to instruct the jury on imperfect self-defense involuntary manslaughter is harmless is unpersuasive. Because the State carries the burden of establishing harmlessness, the State's failure to adequately brief its harmlessness argument is fatal. See *State v. Lowery*, 308 Kan. 1183, 1231, 427 P.3d 865 (2018) (holding that an argument raised incidentally in a party's brief and not argued therein is deemed inadequately briefed and therefore abandoned).

All the same, it is worth noting that even if the State had not abandoned its harmlessness argument, the State could not establish that the trial court's failure to give the imperfect self-defense involuntary manslaughter instruction was harmless beyond a

23

reasonable doubt. As recognized by the State in its brief, the jury rejected its theory that Smith shot A.S. with premeditation during a marijuana sale that went wrong; this is evidenced by the jury's decision to convict Smith of voluntary manslaughter and acquit Smith of using a communication facility to engage in a drug crime. But most importantly, by convicting Smith of the voluntary manslaughter of A.S. on a sudden quarrel as stated under K.S.A. 2016 Supp. 21-5404(a)(1), the jury necessarily believed Smith's testimony that he never intended on killing A.S. Otherwise, it would have convicted him under the first-degree intentional or second-degree intentional murder options. Thus, the fact that the jury convicted Smith of the on sudden quarrel voluntary manslaughter—the least severe form of homicide it was instructed on—suggests that the jury believed the most important part of Smith's defense—that he never went into the apartment with the intention of killing A.S. but instead acted in self-defense. As a result, the jury's rejection of the State's theory supports that had it been given the option, the jury may very likely have convicted Smith of the imperfect self-defense involuntary manslaughter of A.S. under K.S.A. 2016 Supp. 21-5405(a)(4) because it believed Smith had a valid claim of self-defense against A.S. but ultimately used excessive force while defending himself.

In short, because the jury rejected the State's theory of its case by acquitting Smith of using a communication facility to engage in a drug crime and finding Smith guilty of voluntary manslaughter, it is very probable that if given the option to convict Smith of imperfect self-defense involuntary manslaughter under K.S.A. 2016 Supp. 21-5405(a)(4), the jury would have done so. Thus, the trial court's failure to instruct the jury on imperfect self-defense involuntary manslaughter was not harmless.

For this reason, we reverse Smith's conviction for the on sudden quarrel voluntary manslaughter of A.S. under K.S.A. 2016 Supp. 21-5404(a)(1), vacate his corresponding sentence, and remand the case for a new trial on whether Smith committed (1) an on sudden quarrel voluntary manslaughter of A.S. under K.S.A. 2020 Supp. 21-5404(a)(1) or (2) an imperfect self-defense involuntary manslaughter of A.S. under K.S.A. 2020

24

Supp. 21-5405(a)(4). See K.S.A. 2020 Supp. 21-5110(e) (stating that "[i]n no case where a conviction for a lesser included crime has been invalidated, set aside, reversed or vacated shall the defendant be subsequently prosecuted for a higher degree of the crime for which such defendant was originally convicted"); see also *In re Berkowitz*, 3 Kan. App. 2d 726, Syl. ¶ 11, 602 P.2d 99 (1979) (holding that "[w]hen a conviction is set aside any new trial is limited to the crime originally charged or, if conviction was on a lesser included offense, the included crime for which the defendant was convicted").

*Imperfect self-defense attempted involuntary manslaughter*

Once more, although the State agrees that the instruction would have been legally appropriate, the State asserts that an instruction on imperfect self-defense attempted involuntary manslaughter as a lesser included offense of Smith's attempted intentional first-degree murder charge for the attempted killing of B.G. was factually inappropriate because none of the evidence presented at Smith's trial supported a finding that Smith initially shot at B.G. in self-defense but then used excessive force. It contends that under the evidence presented at Smith's trial, the jury only had two options: It could accept Smith's self-defense claim or it could reject Smith's self-defense claim.

According to Smith's trial testimony, he believed that B.G. was grabbing for the missing black handgun when she dropped her cell phone, *but he never actually saw B.G. holding the black handgun*. When asked, Smith explicitly testified that he had never seen a gun on B.G. before. Because the evidence indicates that Smith never actually saw B.G. with the black handgun before shooting towards B.G., Smith's imperfect self-defense claim against B.G. is much weaker than his imperfect self-defense claim against A.S. The entirety of his imperfect self-defense claim against B.G. hinges on a belief he had that B.G. was dropping her cell phone to grab for the missing black handgun. Thus, Smith's testimony that he believed B.G. was grabbing for the black handgun is evidence that Smith was attempting to knowingly kill B.G. on an unreasonable but honest belief that

25

she was reaching for the black handgun—an unreasonable but honest belief that circumstances existed justifying his use of deadly force as required to commit an imperfect self-defense attempted voluntary manslaughter under K.S.A. 2016 Supp. 21-5404(a)(2) and K.S.A. 2016 Supp. 21-5301 (the attempt statute)—which is the crime the jury ultimately convicted Smith of committing against B.G.

Indeed, it was uncontroverted that Smith was the initial aggressor. Smith testified that he never saw B.G. holding the black handgun. On the other hand, B.G. testified that Smith shot at her five to six times in total, with one bullet making a hole in her sweatshirt as it grazed her right arm. The State introduced photos that showed a hole in the right arm of B.G.'s sweatshirt.

Because Smith did not request the imperfect self-defense attempted involuntary manslaughter instruction, however, Smith must establish that the trial court's failure to give the instruction was clearly erroneous by firmly convincing us that the jury would have reached a different verdict but for the instruction error. See *McLinn*, 307 Kan. at 318. In his brief, Smith argues that the trial court's failure to give this instruction as a lesser included offense of his attempted intentional first-degree murder charge for the attempted killing of B.G. was clearly erroneous because "[f]rom the evidence, the jury could find that [he] acted to defend himself from a perceived threat from [B.G.], but the circumstances did not justify his use of deadly force."

But like the State's earlier harmlessness argument, Smith has inadequately briefed his argument that the trial court's failure to instruct the jury on imperfect self-defense attempted involuntary manslaughter constituted clear error. Smith's mere contention that the jury may have found him guilty of imperfect self-defense involuntary manslaughter because some evidence supported that he committed an imperfect self-defense attempted involuntary manslaughter against B.G. is conclusory. Smith has included no references to facts or analysis to support his argument. In a nutshell, Smith has raised his clear error

argument incidentally in his brief and has not argued it there. As a result, we reject Smith's argument because Smith has inadequately briefed and thus abandoned his ability to argue the trial court committed clear error by not instructing the jury on imperfect self-defense attempted involuntary manslaughter. See *Lowery*, 308 Kan. at 1231 (holding that argument raised incidentally in party's brief and not argued therein is deemed inadequately briefed and therefore abandoned).

Because we have determined that there was no evidence justifying an imperfect self-defense attempted involuntary manslaughter instruction, we reject Smith's argument to reverse his attempted voluntary manslaughter conviction for the attempted killing of B.G.

*Forcible felony instruction*

Once more, K.S.A. 2020 Supp. 21-5222(a) allows a person to use force against "another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force." And under K.S.A. 2020 Supp. 21-5222(b), a person may use deadly force against another when "such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." Yet, K.S.A. 2020 Supp. 21-5226(a) prohibits a person from using the force described under K.S.A. 2020 Supp. 21-5222(a)-(b), when that person uses such force while "attempting to commit, committing or escaping from the commission of *a forcible felony*." (Emphasis added.) As a result, a defendant cannot validly argue self-defense if that defendant took his or her defensive actions while engaging in a forcible felony.

K.S.A. 2020 Supp. 21-5111(n) defines the term "forcible felony." It provides that whenever the term forcible felony appears in the Kansas Criminal Code, the term

27

encompasses "any treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, aggravated battery, aggravated sodomy and *any other felony which involves the use or threat of physical force or violence against any person*." (Emphasis added.) Thus, under the plain language of K.S.A. 2020 Supp. 21-5111(n), in addition to the listed felonies, a forcible felony includes all felonies involving threats of physical force or violence against another person.

As previously mentioned, during the jury instruction conference, the trial court granted the State's request to give a forcible felony instruction regarding the evidence indicating Smith might have been involved in a marijuana sale over Smith's objection. As a result, in addition to instructing the jury on the elements of marijuana distribution, the trial court instructed the jury that "[a] person is not permitted to use physical force in defense of himself if he is attempting to commit, committing, or escaping after the commission of distribution of marijuana." Of note, the trial court provided the jury with an aider and abettor instruction; thus, the jury also had the option of rejecting Smith's self-defense claim if it believed Smith aided or abetted A.S. in the commission of selling marijuana.

In his brief, Smith recognizes that K.S.A. 2020 Supp. 21-5226(a) authorized the trial court to give the forcible felony instruction had he killed A.S. during the commission of a forcible felony as meant under K.S.A. 2020 Supp. 21-5111(n)'s definition of forcible felony. And in passing, he also recognizes that our Supreme Court has held that the attempted sale of marijuana constitutes a forcible felony prohibiting a defendant from arguing self-defense in *State v. Beltz*, 305 Kan. 773, 781, 388 P.3d 93 (2017). Still, Smith argues that the trial court erred when it gave the forcible felony instruction because the plain language of K.S.A. 2020 Supp. 21-5705—the unlawful distribution of a controlled substance statute—establishes that selling marijuana is not a forcible felony as meant under the plain language of K.S.A. 2020 Supp. 21-5111(n)'s forcible felony definition. He further contends that this error requires reversal of all his convictions.

28

To support this argument, Smith reviews the Kansas caselaw addressing what constitutes a forcible felony prohibiting a defendant from arguing self-defense. Following his review, he contends that Kansas appellate courts have wrongly conflated the term forcible felony as meant under K.S.A. 2020 Supp. 21-5111(n)'s forcible felony definition with the term "inherently dangerous felony" as meant under K.S.A. 2020 Supp. 21-5402(a)(2)—the felony-murder statute. According to Smith, under the plain language of K.S.A. 2020 Supp. 21-5111(n), only felonies that involve "violence, physical force, or the threat of either" can constitute forcible felonies that prohibit defendants from arguing self-defense. He thus concludes that the trial court erred when it gave the jury the forcible felony instruction because per K.S.A. 2020 Supp. 21-5705's plain language, selling marijuana is not a crime that involves violence, physical force, or the threat of either as required to constitute a forcible felony under K.S.A. 2020 Supp. 21-5111(n)'s forcible felony definition.

The State counters that we are duty bound to follow our Supreme Court's precedent in *Beltz*. It argues that because the *Beltz* court ruled that the attempted sale of marijuana constituted a forcible felony, we must similarly rule that the actual sale of marijuana constitutes a forcible felony under K.S.A. 2020 Supp. 21-5226(a). Alternatively, the State argues that any error resulting from the trial court's decision to give the forcible felony instruction was harmless beyond a reasonable doubt. It contends that because the jury rejected its theory about Smith intentionally killing A.S. during a marijuana sale that went wrong, the trial court's forcible felony jury instruction had no bearing on the jury's verdicts.

In short, we are persuaded by the State's arguments.

In *Beltz*, our Supreme Court rejected Beltz' argument that the trial court erred when it denied his request to instruct the jury on self-defense because it concluded that Beltz killed the victim while committing the forcible felony of attempting to sell

29

marijuana. On appeal, Beltz argued that the trial court erred by rejecting his requested self-defense instruction because the attempted sale of marijuana was not a forcible felony under K.S.A. 2020 Supp. 21-5226(a). But the *Beltz* court determined that the trial court properly denied Beltz' self-defense instruction request because the attempted sale of marijuana is a forcible felony. 305 Kan. at 781. In reaching this holding, the *Beltz* court emphasized that Beltz and the other people involved in the disputed marijuana sale were all carrying guns. It then noted that Kansas courts have "consistently found that the sale of drugs under similar circumstances is a forcible felony." 305 Kan. at 781. So, in *Beltz*, our Supreme Court held that drug sales, especially drug sales that involve guns, constitute forcible felonies that prohibit a defendant from arguing self-defense as stated under K.S.A. 2020 Supp. 21-5226(a).

Smith here freely acknowledged that it was not "unusual" for guns to be displayed throughout A.S.'s apartment. Indeed, in justifying his self-defense claim against B.G., Smith testified that he believed B.G. had possession of the black handgun that he earlier saw on the apartment's kitchen countertop. Thus, he shot at B.G. because he thought she was reaching for this black handgun as he departed from the apartment.

It is a well-known rule that this court is duty bound to follow our Supreme Court precedent absent some indication our Supreme Court is moving away from the previous holding in dispute. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). Since deciding *Beltz* in 2017, though, there has been no indication that our Supreme Court is moving away from its longstanding position that drug sales, especially drug sales involving guns, constitute forcible felonies under K.S.A. 2020 Supp. 21-5226(a).

In summary, because the *Beltz* holding remains good law, we are duty bound to follow *Beltz*' precedent that drug sales, particularly those involving guns, constitute forcible felonies under K.S.A. 2020 Supp. 21-5226(a). Thus, we rely on the *Beltz* holding

to reject Smith's argument that the trial court erred by giving the forcible felony jury instruction.

Notwithstanding the preceding, any error stemming from the trial court's giving of the forcible felony instruction was harmless beyond a reasonable doubt. This is because by acquitting Smith of using a communication facility to engage in a drug crime, it necessarily follows that the jury rejected its argument that Smith intentionally killed A.S. during a marijuana sale, which is a forcible felony, that went wrong. Otherwise, the jury would have convicted Smith of using a communication facility to engage in a drug crime based on the text messages recovered from A.S.'s cell phone that the State offered as evidence that Smith came over to the apartment the afternoon of February 2, 2017, to buy marijuana from A.S. Because the jury rejected this theory, it follows that the jury also disregarded the forcible felony instruction—stating that Smith was not permitted to use force in self-defense while also committing the forcible felony of selling marijuana.

In short, we reject Smith's request to reverse his convictions based on the trial court's giving of the forcible felony jury instruction for two reasons: (1) because the *Beltz* decision establishes that the trial court properly gave the forcible felony instruction and (2) because any error stemming from the trial court's giving of the forcible felony instruction was otherwise harmless beyond a reasonable doubt.

*Misdemeanor child endangerment instruction*

To commit aggravated child endangerment under K.S.A. 2020 Supp. 21-5601(b)(1), a person must "recklessly caus[e] or permit[] a child under the age of 18 years to be placed in a situation in which the child's life, body or health *is endangered*." (Emphasis added.) Yet, to commit misdemeanor child endangerment under K.S.A. 2020 Supp. 21-5601(a), a person must have "knowingly and unreasonably caus[ed] or permit[ed] a child under the age of 18 years to be placed in a situation in which the

31

child's life, body or health *may be endangered*." (Emphasis added.) Thus, the difference between aggravated child endangerment and misdemeanor child endangerment is whether the defendant actually endangered the child's life, body, or health. See *State v. White*, 55 Kan. App. 2d 196, 201, 410 P.3d 153 (2017).

In his final jury instruction argument, Smith contends that although he never requested an instruction on misdemeanor child endangerment, the trial court clearly erred by failing to give the instruction as a lesser included offense of his aggravated child endangerment charge for endangering K.S. Although Smith frames his argument as an independent jury instruction issue, a review of Smith's argument establishes that it hinges on his contention that insufficient evidence supported his aggravated child endangerment conviction.

In making this argument, Smith stresses that in *State v. Herndon*, 52 Kan. App. 2d 857, Syl. ¶ 7, 379 P.3d 403 (2016), a panel of this court held that to convict a defendant of aggravated child endangerment, "the State must prove not only that the defendant's conduct was unjustifiable and a gross deviation from the reasonable standard of care, but also that the defendant acted with the conscious realization that there was a substantial risk that such conduct would place a child in peril." Relying on this holding, Smith contends that insufficient evidence supported his aggravated child endangerment conviction because he testified that he was unaware of K.S.'s presence when he shot A.S. in self-defense. Smith further argues that insufficient evidence supported his conviction because the fact that law enforcement found K.S. next to A.S.'s dead body does not mean that he actually placed K.S.'s life, body, or health in danger. Based on these arguments, Smith concludes (1) that the trial court had to instruct the jury on misdemeanor child endangerment and (2) that the failure to give this instruction constituted reversible error.

The State counters that it presented ample evidence to support Smith's aggravated child endangerment conviction. It contends that given the weight of this evidence,

32

although an instruction on misdemeanor aggravated child endangerment was legally appropriate, it was not factually appropriate. It therefore asks us to reject Smith's argument that the trial court erred by not instructing the jury on misdemeanor child endangerment as a lesser included offense of his aggravated child endangerment charge for endangering K.S.

As with Smith's forcible felony instruction argument, we are persuaded by the State's arguments.

The State here correctly contends that there was overwhelming evidence supporting Smith's aggravated child endangerment conviction. Smith's argument relies on his own trial testimony that he never realized K.S. was nearby when he shot A.S. while at the same time ignoring the strength of the State's circumstantial evidence indicating that he actually endangered K.S.'s life, body, and health. Indeed, outside of Smith's trial testimony, all of the evidence before the jury suggested that Smith knew K.S. was nearby when he shot A.S. The law enforcement officers who initially arrived at the apartment, all testified about finding K.S. lying on her stomach next to A.S.'s dead body. The State's forensic biologist testified that A.S.'s blood caused the staining found on K.S.'s clothing. Also, Santoro testified about the discovery of a spent bullet underneath K.S.'s baby bouncer in the apartment's living room.

Smith complains that the fact that law enforcement found K.S. next to A.S.'s dead body does not mean that he placed K.S.'s life, body, or health in danger. Nevertheless, the location of K.S. next to the body of her dead father and the other evidence just mentioned constituted significant circumstantial evidence that K.S. was nearby when the shooting occurred. See *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016) (explaining that even gravest offense may be entirely supported by circumstantial evidence so long as such evidence allowed fact-finder to make reasonable inference of guilt). Stated another way, all of this evidence constituted significant circumstantial evidence that Smith placed

33

K.S.'s life, body, or health in danger as required to commit aggravated child endangerment under K.S.A. 2016 Supp. 21-5601(b)(1).

Plainly, this evidence, in and of itself, was substantial enough to support his aggravated child endangerment conviction. See *State v. Killings*, 301 Kan. 214, 223, 340 P.3d 1186 (2015) (holding trial court's erroneous failure to instruct on lesser included offense *harmless beyond a reasonable doubt* when overwhelming evidence supported defendant's conviction). When one additionally considers Smith's recorded jail phone call statement that A.S. "pull[ed] a weapon out with a baby in his hands," it is readily apparent that Smith actually knew A.S. was holding K.S. when he shot him regardless of his trial testimony. And even if we were to ignore this evidence, according to Smith's own testimony, he not only abandoned K.S. after fatally shooting A.S., but he also failed to check on K.S.'s welfare, despite hearing her crying, when he reentered the apartment to recover his belongings after initially driving away. This constitutes overwhelming evidence that Smith recklessly caused or permitted K.S. to be placed in a situation in which her life was actually endangered as required to be convicted of aggravated child endangerment under K.S.A. 2016 Supp. 21-5601(b)(1) regardless of his self-defense claim against A.S. during the shooting inside the apartment.

*Is Smith's criminal possession of a firearm conviction unconstitutional?*

The jury convicted Smith of being a criminal in possession of a firearm contrary to K.S.A. 2016 Supp. 21-6304(a)(1). K.S.A. 2020 Supp. 21-6304(a)(1) bars people who have been previously convicted of a person felony from possessing a firearm if they committed their prior person felony with a firearm. Also, violation of K.S.A. 2020 Supp. 21-6304(a)(1) constitutes a severity level 8, nonperson felony. K.S.A. 2020 Supp. 21-6304(b).

In his next argument on appeal, although Smith concedes that he violated the plain language of K.S.A. 2020 Supp. 21-6304(a)(1), he contends that we should still reverse his criminal possession of a firearm conviction because it is unconstitutional in light of the 2010 amendment to section 4 of the Kansas Constitution Bill of Rights. Smith argues that the 2010 amendment to section 4 "never allows for the criminalization of mere possession" of a firearm because it states that every Kansan has the "[i]ndividual right to bear arms." In making this argument, Smith emphasizes the differences between the amended section 4 and the Second Amendment to the United States Constitution. He contends that we should interpret the amended section 4 as providing Kansans a broader right to firearm possession than the right to firearm possession under the Second Amendment because the Second Amendment merely discusses "the right of *the people* to keep and bear arms." (Emphasis added.)

Nevertheless, as contended by the State, we reject Smith's argument that his criminal possession of a firearm conviction violates section 4 of the Kansas Constitution Bill of Rights because he is raising it for the first time on appeal.

Whether an appellant has preserved an argument for appeal constitutes a question of law over which this court exercises unlimited review. *State v. Haberlein*, 296 Kan. 195, 203, 290 P.3d 640 (2012). Generally, this court does not consider arguments when raised by appellants for the first time on appeal. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). But there are three exceptions to this rule: (1) when "[t]he newly asserted theory involves only a question of law arising on proved or admitted facts and is determinative of the case"; (2) when "consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights"; and (3) when "the [trial] court is right for the wrong reason." 299 Kan. at 493.

In his brief, Smith recognizes that he never challenged his criminal possession of a firearm conviction as unconstitutional before the trial court. Even so, he asks us to

consider his newly raised constitutional challenge under the first and second exceptions to the general rule about not considering arguments raised for the first time on appeal. That is, he asserts that we should consider his constitutional challenge for the first time on appeal because it only involves a question of law arising on proved or admitted facts that is finally determinative of the case and because its consideration is necessary to prevent the denial of his fundamental right to bear arms.

But Smith's preservation argument ignores that even if we could invoke one of the exceptions to the general rule about not considering arguments raised for the first time on appeal, we still have no duty to consider such arguments. In *State v. Gray*, 311 Kan. 164, Syl. ¶ 1, 459 P.3d 165 (2020), our Supreme Court held: "The decision to review an unpreserved claim under an exception is a prudential one. Even if an exception would support a decision to review a new claim, [we have] no obligation to do so." Relying on this rule, our Supreme Court "decline[d] to utilize any potentially applicable exception to review Gray's new [identical offense doctrine] claim." 311 Kan. at 170. Also, it explained that it would not review Gray's newly raised identical offense doctrine claim because by not raising this argument before the trial court, Gray "deprived the trial judge of the opportunity to address the issue in the context of this case" even though "such an analysis would have benefited [its] review" on appeal. 311 Kan. at 170.

Here, we rely on *Gray*'s precedent to decline Smith's request to consider his criminal possession of a firearm conviction constitutional challenge for the first time on appeal. In a nutshell, because Smith failed to raise his constitutional challenge before the trial court, we lack the necessary factual, legal, and historical analysis in the record to adequately address Smith's constitutional challenge. See also *State v. Hastings*, No. 122,184, 2021 WL 2748215, at *2 (Kan. App. 2021) (unpublished opinion) (declining to consider Hastings' identical constitutional challenge to his criminal possession of a firearm conviction for first time on appeal relying on *Gray*); *State v. Valdez*, No. 121,053, 2021 WL 1324023, at *3 (Kan. App. 2021) (unpublished opinion)

36

(declining to consider Valdez' identical constitutional challenge to his criminal possession of a firearm conviction for first time on appeal because his failure to raise argument below created inadequate record); *State v. Miner*, No. 122,372, 2021 WL 401282, at *2 (Kan. App. 2021) (unpublished opinion) (declining to consider Miner's identical constitutional challenge to his criminal possession of a firearm conviction for first time on appeal relying on *Gray*); *State v. Pugh*, No. 120,929, 2021 WL 218900, at *4-5 (Kan. App. 2021) (unpublished opinion) (declining to consider Pugh's identical constitutional challenge to his criminal possession of a firearm conviction for first time on appeal because his failure to raise argument below created inadequate record); and *State v. Johnson*, No. 121,187, 2020 WL 5587083, at *5 (Kan. App. 2020) (unpublished opinion) (declining to consider Johnson's identical constitutional challenge to his criminal possession of a firearm conviction for first time on appeal because his failure to raise argument below created inadequate record).

So despite Smith's argument otherwise, we affirm his criminal possession of a firearm conviction.

*Did the trial court err when sentencing Smith?*

The KSGA, K.S.A. 2020 Supp. 21-6801 et seq., creates a standardized sentencing scheme based on the severity of an offender's current crime of conviction and criminal history. K.S.A. 2020 Supp. 21-6814(a)-(c) provides that before relying on an offender's criminal history to enhance his or her sentence, the offender must either admit his or her criminal history in open court or the sentencing court must find that the State established the offender's criminal history by a preponderance of the evidence. On the other hand, section 5 of the Kansas Constitution Bill of Rights states: "The right of trial by jury shall be inviolate." Also, when analyzing this language, our Supreme Court has consistently held that "'[s]ection 5 preserves the jury trial right as it historically existed at common

37

law when our state's constitution came into existence.'" *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1133, 442 P.3d 509 (2019).

Here, it is undisputed that the trial court relied on Smith's criminal history score of A to enhance his sentences for each of his crimes. For example, by categorizing Smith as having a criminal history score of A, the trial court was able to impose a 233-month prison sentence on Smith for his primary crime of the on sudden quarrel voluntary manslaughter of A.S., which was his standard presumptive sentence under the KSGA. Had the sentencing court not relied on Smith's criminal history to enhance his voluntary manslaughter sentence, Smith's standard presumptive sentence under the KSGA for committing the on sudden quarrel voluntary manslaughter of A.S. would have been 59 months' imprisonment. See K.S.A. 2020 Supp. 21-5404(a)(1), (b); K.S.A. 2020 Supp. 21-6804(a).

In his final argument on appeal, Smith asserts that the trial court violated his jury trial right under section 5 of the Kansas Constitution Bill of Rights when it used his criminal history to enhance the severity of his underlying sentences. In making this argument, he emphasizes that our Supreme Court has consistently held that section 5 preserves the jury trial right as it existed at common law. But he further contends that the common-law jury trial right included an offender's right to have his or her criminal history proven to a jury beyond a reasonable doubt before the sentencing court could rely on such criminal history to enhance his or her sentence. He therefore concludes that section 5 preserves an offender's common-law jury trial right to have his or her criminal history proven to a jury beyond a reasonable doubt before the sentencing court could use that offender's criminal history to enhance his or her sentence. And he argues that this, in turn, means that the current KSGA sentencing scheme violates section 5 since it allows the sentencing court to rely on an offender's criminal history to enhance the offender's sentence without first proving that offender's criminal history to a jury beyond a reasonable doubt. As a result, he asks us to vacate his sentences and remand the case to

the trial court with directions to resentence him without consideration of his criminal history.

But as the State counters in its brief, Smith's constitutional challenge to the validity of his sentences is unpersuasive because he is raising it for the first time on appeal and because it is otherwise premised on a flawed legal argument. Once again, whether an appellant has properly preserved an argument for appeal and whether a statute is unconstitutional constitute questions of law over which this court exercises unlimited review. *Haberlein*, 296 Kan. at 203; *Dissmeyer v. State*, 292 Kan. 37, 39, 249 P.3d 444 (2011).

In his brief, Smith recognizes that he is raising this constitutional challenge for the first time on appeal. Still, he asks us to consider his argument for the first time on appeal under the exceptions allowing for such consideration when the newly raised issue involves only a question of law arising on proved or admitted facts that is finally determinative of the case and when consideration of the newly raised issue is necessary to serve the ends of justice. But we decline Smith's request. See *Gray*, 311 Kan. at 170 (holding that even if exception to general rule against considering issues for first time on appeal applied, appellate courts have no obligation to apply such exception). In short, as with his constitutional challenge to his criminal possession of a firearm conviction, Smith's failure to raise this argument below means that the record, and therefore this court, lacks the benefit of factual, legal, and historical analysis to adequately address his current constitutional challenge to his sentences.

Affirmed in part, reversed in part, vacated in part, and remanded for a new trial on whether Smith committed (1) an on sudden quarrel voluntary manslaughter of A.S. under K.S.A. 2020 Supp. 21-5404(a)(1) or (2) an imperfect self-defense involuntary manslaughter under K.S.A. 2020 Supp. 21-5405(a)(4).